ARA VIRGINIA HENTHORN, *Admrx., Etc.*

*v.*

CARL LONG

(No. 12103)

Submitted September 19, 1961.   Decided October 24, 1961.

*James W. Pyles, Jack Hawkins, Prosecuting Attorney,* for plaintiff in error.

*Snyder & Hassig,* for defendant in error.

CALHOUN, JUDGE:

This case involves a wrongful death action growing out of a motor vehicle collision resulting in a verdict for the defendant, which the trial court declined to set aside. The basic defense was predicated on the sudden emergency doctrine.

On the morning of August 11, 1958, Arthur William Henthorn and Howard Eugene Miller were proceeding in a northwesterly direction on State Route No. 20 and 7 toward New Martinsville in Wetzel County in a 1951 model Chevrolet automobile, owned and then being operated by Henthorn. At a point referred to in the testimony as the "twin bridges", Henthorn stopped his automobile near the eastern end of a narrow concrete bridge and on his right side of the highway, in order to permit an oncoming pickup truck, and perhaps one or more other vehicles following the pickup truck, to cross the narrow bridge from the opposite direction.

While the automobile was stationary at that place, it was struck from the rear by a 1956 model 2-ton Ford truck then owned and being operated by Carl Long. As a consequence of that collision, the automobile was rammed into the right side of the concrete bridge on the eastern end thereof with such force and violence that the automobile was demolished, Henthorn, the driver, was killed, and Miller, the passenger in the automobile suffered a broken back and other injuries. In this wrongful death action consequently instituted in the Circuit Court of Wetzel County by Ara Virginia Henthorn, as administratrix of the estate of her deceased husband, Arthur William Henthorn, against Carl Long, a jury returned a verdict in favor of the defendant. From a judgment entered on such verdict by the trial court on May 27, 1960, the administratrix prosecutes this writ of error. The plaintiff has filed a motion to reverse, pursuant to leave granted by this Court on May 8, 1961. A consideration of the several assignments of error urged in behalf of the plaintiff necessitates a rather extended summary of the pertinent facts and circumstances disclosed by the testimony.

The collision occurred about 7:45 a. m., while Henthorn and Miller were proceeding from their respective homes in Wetzel County with an intention to go to Weirton, West Virginia. The impact caused Henthorn to be thrown forward against the steering wheel of his automobile, causing its horn "to stick and blow". His resultant death apparently was instantaneous.

From photographs exhibited and from the testimony of witnesses it appears that eastward from the point of impact, the direction from which both vehicles had proceeded, there is a slight and gradual ascent extending for perhaps as much as 1,000 feet. The weather was clear and dry. At a point 475 feet eastward from the bridge, there was a highway marker bearing the words "Narrow Bridge". The paved portion of the highway at the eastern edge of the bridge was 17 feet, 6 inches in width. The defendant was familiar with the highway

in the area in question, having traveled over it frequently prior to the date of the accident.

Arthur William Henthorn owned and operated a small farm near Piney in Wetzel County, and Howard Eugene Miller lived with his grandmother on an adjoining farm. Miller testified that during the trip from Piney to the scene of the accident, Henthorn operated the automobile at a speed of about 40 to 45 miles an hour; that at Porters Falls, a distance of ten or eleven miles eastward from the twin bridges, he first noticed the Long truck following at a distance of about 500 feet in the rear of the automobile; that he observed the truck three or four times thereafter; that he last observed the truck at almost the instant it struck the automobile and prior to that time he last observed the truck about one mile eastward from the scene of the accident at a place of business known as the "Cabbage Patch"; that Henthorn's automobile was then traveling approximately 45 miles an hour; that the truck was "keeping about the same distance" or "holding about the same distance" from the automobile each time he observed it prior to the moment of collision; that Henthorn gave an appropriate arm signal and stopped his automobile on the right side of the highway at a point near the third guard rail post eastward from the eastern end of the bridge; that the Henthorn automobile was in its stationary position about twelve seconds prior to the time it was struck from the rear by the truck; and that he had "no idea" of the speed of the truck when he last saw it immediately preceding the impact.

Riley Beegle, a constable of Magnolia District of Wetzel County, a witness for the plaintiff, testified that he went to the scene of the accident at the suggestion or request of the chief of police of the City of New Martinsville; that he arrived at the scene about the time the ambulance was leaving with the two injured persons; and that one of such persons "looked like he was dead." Beegle testified further that at that time and place Carl Long, the defendant, told

him "it was his fault, that he was on his way to New Martinsville to get his brakes fixed"; and that he said "he was sorry because these boys were both friends of his, and he was sorry that happened, and he said they came down the hill there, that he pumped his brakes on the truck, and he didn't have any brakes"; that he was about three hundred feet, apparently from the Henthorn automobile, when he first undertook to apply his brakes; and that he stated further that he "found out he didn't have any brake, and he reached across to an emergency brake, and he hit a button there which throwed it into neutral". Constable Beegle testified that there was on the floor of the cab of the truck a can lying on its side, from which was flowing or spilling a liquid which "looked like, smelled like brake fluid". The witness denied that Long stated that he was going to New Martinsville to have his brakes merely "tightened" or "adjusted" or to have his battery checked, but rather that Long stated he was going to New Martinsville to have his brakes "fixed". At the request of Sheriff S. W. Westerman, Beegle took the defendant to New Martinsville for questioning.

S. W. Westerman, Sheriff of Wetzel County, arrived at the scene of the accident after Long's truck had been moved westward across the bridge and parked in front of a nearby store. As a witness for the plaintiff, he testified that the "Chevrolet was completely smashed in. It was shoved clear to the front. The Ford truck was damaged on the right side. The better part of the damage was on the right side of the front." This testimony relative to the nature of damage to the two vehicles is confirmed by photographs which are made exhibits. Sheriff Westerman did not talk with the defendant at the scene of the accident, but he did question him later in New Martinsville. In relation thereto the sheriff testified: "Well, he told me that he was—he left Reader, and he had about a half a brake * * *. He told that to me, that he had about a half a brake, and he was starting to New Martinsville to have his brakes repaired. He came to within three hundred feet of

the bridge where the accident occurred, and he pumped on his brake, and his brake wouldn't work. He pumped several times and it wouldn't work. He grabbed for his emergency, and by grabbing for his emergency, he hit some kind of a button—I don't know what it is—and threw it into neutral, thereby the emergency brake wouldn't work at all.'' The sheriff testified further that he caused the truck to be examined later that day on the premises of Bridgeman Motors in New Martinsville by Carl Reed, an automotive mechanic, and that such examination ''revealed very little brake fluid in the cylinders.''

Carl Reed, an automotive mechanic since 1946, testifying for the plaintiff, stated that he examined the defendant's truck on Bridgeman Motors' used car lot on the day on which the accident occurred. He testified that on a truck of this type there is a ''master cylinder'' under the floor boards on the driver's side, sufficient in size to contain one-half pint of brake fluid, and that each wheel is equipped with a cylinder for the purpose of containing brake fluid as a part of the braking system. The brake fluid is forced from the master cylinder to the several wheel cylinders by a ''vacuum booster.'' He testified further that the master cylinder ''governs'' all the wheel brakes, and that when he examined the truck, he discovered that the master cylinder was empty. From his testimony it appears that ''pumping'' the foot brake causes the brake fluid to be supplied to the several wheel cylinders, and that if one of such wheel cylinders develops a leak, the brake fluid in the master cylinder eventually may become emptied therefrom. Apparently ''pumping'' the foot brake will hasten this process of forcing the brake fluid from the braking system. From the examination of the truck made by the witness, he was unable to state when or how the brake fluid left the braking system. It appears rather clearly from the testimony of the witness that when a leak develops in one of the wheel cylinders, the loss of braking capacity is not sudden, but rather the loss of effectiveness of

the wheel brakes takes place gradually with the increased loss of the brake fluid. He was asked the following questions, and he gave the following answers:

"Q. Mr. Reed, if the wheel cylinder goes out, does that make the entire braking system go out? Does that affect the other wheels?

"A. In due time when it leaks enough fluid out your master cylinder is dry. It will affect all brakes.

"Q. But if it just commences to leak, what effect does that have before it has leaked all the fluid out?

"A. My experience I found it will give you a sponge pedal - soft pedal. Instead of the pedal going so far and stopping, it will be kind of spongy like.

"Q. But it can stop the vehicle? Is that correct?

"A. Yes."

John Bridgeman of Bridgeman Brothers or Bridgeman Motors, Ford dealer at New Martinsville, a witness for the plaintiff, examined the defendant's truck on the used car lot on the day of the accident. He testified: "I tried the brake pedal, and it went clear to the floor. It didn't have any reserve pedal." He testified further that the "right rear wheel cylinders were replaced." Later he spoke of "cylinder" in the singluar rather than "cylinders". He was asked the following questions and gave the following answers:

"Q. Was there brake fluid on the wheel?

"A. Yes, sir.

"Q. Can you tell what was wrong with the cylinder?

"A. The rubber caps were leaking.

"Q. Do you know what made the leak, if you know?

"A. Wear and tear, I imagine.

"Q. Did you in addition to replacing the cylinder, tighten the brake?

"A. I couldn't tell you. I don't recall. It is possible we did.

"Q. After you replaced the cylinder, I assume you also put brake fluid in it?

"A. Yes."

John E. Titus, a witness for the defendant, testified that he, as an employee of the defendant, had operated the truck in question almost exclusively; that Carl Long may have "been in it two or three times * * * but he had never delivered a load that I know of, but he had driven the truck empty a time or two, but outside of that I was the only man that operated it." Titus further testified that on the preceding Friday he delivered a load of lumber with the truck from the defendant's sawmill, situated one mile below Reader on Route 20, to a mine near Moundsville; and that he did not operate the truck thereafter prior to the day of the accident. Titus testified further that on Monday morning, the day on which the accident occurred, it was necessary to push the truck in order to start the operation of its motor, because "the starter wouldn't work." Apparently Carl Long was in the driver's position when his employees pushed the truck in order to get its motor operating. In relation to the situation then existing, Titus testified as follows: "Well, Mr. Long pulled back in, * * * and got out of the truck, and he said, 'Well, I will have to get that starter fixed', and I said to him, I said, 'If you are going to get the starter fixed,' and I said to him, I said, 'If you are going to get that starter fixed, you better have the brakes adjusted, they are beginning to get loose,' and he said, 'Well, you go ahead and operate the mill. I will take the truck to the garage.' " Titus was asked the following questions, and gave the following answers:

"Q. You said something about the brakes being loose?

"A. The brakes was loose. They needed adjusted up. The pedal didn't have sufficient to pedal it.

"Q. How much pedal did it have?

"A. It had plenty of pedal to stop the truck without pumping. *Of course, I didn't try to work it that*

*morning at all*, but you could have pumped the brake and got more pedal, but I didn't. *I drove it in there and stopped on the emergency brake."* (Italics supplied.)

In another portion of his testimony, in relation to the brakes, Titus testified: "They were down some, but they had plenty of pedal *capable of stopping an empty truck or unloaded truck if it was stopped in a reasonable distance."* (Italics supplied.) Titus denied that there was any brake fluid in the cab of the truck on the day in question, but he says that on Sunday, the day before the accident, he took a can of brake fluid from the truck and used it to restore the brakes in his own automobile, and did not replace it in the truck. Nevertheless, he testified: *"At the time I drove it to the Ford garage* there was a mashed up can of brake fluid in the glove compartment of the truck, and it leaked over the maps and everything, put in there by somebody else. I don't know how it got there." (Italics supplied). Immediately thereafter he testified as follows:

"Q. Do you recall how many days it was after that accident you found it in the glove compartment?

"A. *It was so we got the truck back. They worked on the truck on Tuesday, and we got the truck back on Wednesday.* Wednesday, the same day, I could smell the brake fluid, and it was in the glove compartment of the truck leaking out." (Italics supplied.)

It is clear from the testimony of the defendant and of Carl Reed, the mechanic, that the emergency brake operated independently of the brakes on the truck wheels, which were operated by the foot pedal. The defendant testified that, on the gear shift lever located to the right of the driver, there was a "switch button" which controlled the two-speed axle. Long testified further that Titus had told him over the week-end that he was going to have his brakes "adjusted", and that at the sawmill on the morning in question it was his intention to have the starter fixed and the brakes "adjusted". In connection with the situation at that

time and place he testified: "I tried my brakes, and they was low. That is, low on the pedal, and I pumped them, the brake come up, see. I would say it wasn't quite half a pedal as we say was the pedal range * * *." Consequently, he left the sawmill "between seven-fifteen and seven-thirty" intending to go to Bridgeman Brothers' garage. He admitted on cross-examination that instead of traveling fourteen miles to New Martinsville, he could have traveled four or five miles of "level driving" to Pine Grove, and that he could have had his starter and brakes repaired at one of the garages located at that place.

He testified that he had no difficulty with the brakes until he neared the scene of the accident as hereinafter stated. Meantime, he recalled having observed the Henthorn automobile ahead and following it "through several miles". In descending two hills known as Long Point and Slim Chance, he noted that the foot brake "I would say, would be about one-third of the pedal. Just a little better than around two inches." He recalled having seen the Henthorn automobile ahead about four to five hundred feet, as he "passed the location known as the Cabbage Patch". He testified that he observed the Henthorn automobile in a stationary position near the bridge, and that when he came over the hill about one thousand feet eastward, he could see it. The defendant testified further that when perhaps three hundred feet or more eastward, he observed the Henthorn automobile "stopped", and at a point about two hundred and seventy feet eastward, he undertook to apply his foot brake "and it went to the floor. I didn't have no brake." In relation to the situation at that juncture, he stated: "At that time I reached for my emergency brake. I don't remember hitting this button, but that is the only thing that I can realize that caused it to jump into neutral, and I heard this whining in the drive shaft, and I know she jumped out of gear." He testified that he continued without success to pump his foot brake and that he tried unsuccessfully to get the truck back in gear. Consequently, the severe and violent impact resulted as stated earlier herein.

In brief, the defendant asserts in substance that without previous fault on his part, a sudden emergency was created by the failure of his foot brakes to operate when he undertook to apply them at a point about two hundred and seventy feet from the Henthorn automobile; that thereafter he acted as a reasonably prudent man in such emergency; and that, therefore, he is not subject to liability to the plaintiff for damages in this action.

Over objection of the plaintiff the trial court gave the defendant's instructions numbered three and four, respectively, dealing with the sudden emergency doctrine, as follows:

"INSTRUCTION NO. 3: The Court instructs the jury that where a person is confronted with a sudden emergency, the failure on his part to exercise the best judgment the situation renders possible does not establish such lack of care on his part as will render him liable for any resulting injury. Stated another way, the law does not require of a person who is acting in the face of sudden danger that his act be infallible or even that he act wisely. Therefore, in this case, if you believe from the evidence that as the defendant, Carl Long, approached the place where the Henthorn automobile was located, the defendant, while theretofore operating his truck with reasonable care and caution under the circumstances, was suddenly confronted with an emergency in the effectiveness of his brakes, which condition he had not observed and by the exercise of reasonable care could not have observed before that time, and if you further find that the said Carl Long upon the discovery of such condition did what an ordinary, reasonable and prudent person would have done under similar circumstances, then the defendant Carl Long was not guilty of negligence.

"INSTRUCTION NO. 4. The Court instructs the jury that even though they may believe from a preponderance of the evidence in this case that at the instance of the collision in this case between the motor vehicle of the plaintiff's decedent Arthur William Henthorn and the defendant Carl Long, the foot brake on the motor vehicle of the defendant Carl Long was inoperative because of a defect, and was not

in good working order or adequate to control the movement of and to stop and hold such motor vehicle as required by the statutes of the State of West Virginia, yet if the jury further believe from a preponderance of the evidence that, under the facts and circumstances in this case, such brake failure occurred wholly without the fault of the defendant Carl Long, under circumstances which made it impossible for such defendant to comply with such statutory requirements at the moment complained of, and under circumstances which due care and prudence on his part could not have guarded against prior to such collision, then any such violation of such particular statute by the defendant Carl Long under such circumstances is excusable."

The court reporter's transcript of the testimony and of the other trial proceedings does not disclose, in the usual way, any objections to any of the instructions offered. However, in a separate bill of exceptions, the plaintiff sets forth the instructions copied above, and the bill of exceptions states that objections to such instructions were as follows:

"The Plaintiff offered objections to Instruction No. 3 and 4 saying that Instruction No. 3 used the phrase 'Which condition he had not observed and by exercise of reasonable care could not have observed before that time.' This instruction is unclear as to the meaning of the word observe. The Plaintiff objected to the giving of Instruction No. 4 saying it limits the brake failure to the words 'moment complained of.' Plaintiff felt that there was sufficient evidence in this case to show that the brakes needed some work on them when the Defendant left Reader, and that he had an opportunity to drive four miles to Pine Grove to a garage, but he chose to come to New Martinsville, a distance of fourteen miles and over hilly, twisting roads, and we feel that there was sufficient evidence that Carl Long should have examined the brakes before leaving from the saw mill at or near Reader."

While such objections are somewhat general, we deem them adequate to question the sufficiency of the evidence to support them and to challenge the propriety

of the court's action in instructing the jury in relation to the sudden emergency doctrine in the light of the testimony, facts and circumstances properly exhibited by the record.

The sudden emergency doctrine was summarized in the second point of the syllabus of the case of *Reilley v. Byard,* 146 W. Va. 292, 119 S. E. 2d 650, as follows: "A person in a sudden emergency, *not created in whole or in part by his own negligence,* who acts according to his best judgment or who, because of insufficient time to form a judgment, fails to act in the most judicious manner, is not guilty of actionable negligence if he exercises the care which would be exercised by a reasonably prudent person in like circumstances." (Italics supplied). See also *Reece v. Hall,* 142 W. Va. 365, 372, 95 S. E. 2d 648, 653. An important aspect or qualification of the doctrine is succinctly stated in the tenth point of the syllabus in the recent case of *Crum v. Ward, et al.,* (decided by this Court on June 20, 1961), 146 W. Va. 421, 122 S. E. 2d 18, as follows: "In an action for damages for personal injuries, a defendant can not rely on the sudden emergency doctrine where his own action has created, *in whole or in part,* the sudden emergency." (Italics supplied.) The second point of the syllabus of *Cline v. Christie,* 117 W. Va. 192, 184 S. E. 854, is as follows: "The driver of a motor vehicle who has violated rules of the road may not invoke the doctrine of sudden emergency to relieve himself from liability to one injured as a result of such violation." The same proposition is stated in similar language in the tenth point of the syllabus of *Elswick v. Charleston Transit Co.,* 128 W. Va. 241, 36 S. E. 2d 419, as follows: "The driver of a motor vehicle cannot invoke the doctrine of sudden emergency to relieve himself from liability to another whom he has injured as the result of his violation of a regulatory traffic statute." See also *Somerville v. Dellosa,* 133 W. Va. 435, 443, 56 S. E. 2d 756, 762; *Isabella v. W. Va. Transportation Co.,* 132 W. Va. 85, 93, 51 S. E. 2d 318, 323; *Chaney v. Moore,* 101 W. Va. 621, pt. 5 syl., 134 S. E. 204.

There is in this case no testimony from which the jury could have determined reasonably and properly either that an emergency arose suddenly or that, if there was an emergency within legal contemplation, it arose without negligence or fault on the part of the defendant. The defendant knew, before he embarked upon the 14-mile journey over a hilly highway, that the brakes on the truck were defective. He knew this because Titus so advised him, and also because, while still at his place of business, he tested the brakes and found that they were "low", had "less than a half a pedal." Obviously, he knew it as he proceeded on his journey, because he does not contend that the impared condition of the brakes later became corrected or lessened. On the other hand, he admits that while descending the two hills described in his testimony, he had a one-third pedal, apparently less than the approximately one-half pedal which he discovered before he left the sawmill.

We are not impressed by the tenacious adherence of Long and Titus to the contention that the foot brakes merely needed to be "adjusted" or "tightened", rather than "fixed", as Constable Beegle quoted Long as having stated; or "repaired", as Sheriff Westerman quotes Long as having described the purpose of his journey to New Martinsville. Indeed the testimony clearly refutes the accuracy of the terminology employed by Long and Titus in saying or implying that the brakes merely needed to be adjusted or tightened. The defense, on the contrary, is predicated on the proposition that an emergency was caused because of a loss of brake fluid; and while John Bridgeman and Carl Reed testified fully concerning the subsequent correction of the defective condition of the brakes, there was no effort to develop by either of such witnesses that the brakes were "tightened" or "adjusted", or that they were in need of anything of that nature. On the contrary, the entire testimony discloses unmistakably that the wheel brakes were defective because of loss of brake fluid. The defendant testified that he

had operated motor vehicles for forty-one years. His testimony gives evidence of a rather unusual knowledge of automotive mechanics and of experience in that field. He testified at length, and apparently with peculiar knowledge, concerning the operation of both the foot brakes and of the emergency brake on a truck such as that herein involved. The defense evidence discloses that extra brake fluid was regularly carried in the truck. It is reasonable to assume that the defendant knew the characteristics or symptoms of lack of adequate brake fluid in the braking system, and that he knew the significance thereof. The evidence fails to disclose that the "leak" in the cylinder on the right rear wheel of the truck was of such a nature as to cause the brakes to become completely inoperative suddenly or without reasonable basis for prior adequate warning. Since the defective nature of the brakes is not accounted for on any other basis, and since the evidence utterly fails to disclose that the brakes needed to be "adjusted" or "tightened" on any other basis or in any other manner than by correcting the situation pertaining to brake fluid in the braking system, we must assume that the leak commenced prior to the time when Titus drove the truck with defective brakes to the sawmill on the preceding Friday and stopped it there by means of the emergency brake.

The case is somewhat unique in that apparently there is no contention that Arthur William Henthorn, the deceased, was guilty of the slightest negligence in the premises, and apparently there is no basis for such an implication or contention. Rather his death resulted from the act of the defendant in deliberately taking a truck with defective brakes upon the highway and the act of the defendant, according to his testimony, in throwing his truck into neutral in undertaking to apply its emergency brake. For reasons stated we feel that neither of such instructions was warranted by the evidence, and that the trial court erred, under the state of the testimony before us, in submitting the question of the defendant's negligence to the jury on the basis of

the sudden emergency doctrine. "An instruction which is not sustained by evidence should not be given." *State v. Cirullo,* 142 W. Va. 56, pt. 4 syl., 93 S. E. 2d 526, in which numerous prior decisions of this Court to the same effect are listed.

The plaintiff complains of the refusal of the trial court to grant her instruction Number 6, as follows:

"The court further instructs the jury that it was the duty of the defendant Carl Long to have the brakes on his truck in such condition so that they would be capable, at all times and under all conditions of loading, of being stopped on a dry, smooth, level road free from loose material upon application of the service (foot) brake, within the distances specified below, or should have been capable of being decelerated at a sustained rate corresponding to these distances.

| | "Feet to stop 20 miles per hour | Deceleration in feet per second |
|---|---|---|
| "Vehicles having brakes on all wheels | 30 | 14 |
| Vehicles not having brakes on all wheels | 40 | 10.7 |

"And further it was the duty of the defendant Carl Long to maintain his brakes in good working order and to be so adjusted as to operate as equally as practicable with respect to the wheels on opposite sides of the vehicle."

The instruction is substantially in the language of that portion of Chapter 129, Acts of the Legislature, Regular Session, 1951, appearing in Code, 1931, as amended, as Chapter 17C, Article 15, Section 31 (b) and (c). Counsel for the defendant contend that the instruction was not applicable to the instant situation because the statute refers to a "smooth, level road", and there is no proof that the road at the area in question was a "smooth, level road." We are unable to preceive the force of such reasoning. The statutory provisions deal with the required performance ability of brakes, and the maintenance thereof. Obviously, the time required for stopping a vehicle is greater and the possible

deceleration rate is not as rapid on a steep descent as on a smooth, level road. But a motorist is required to have brakes which measure up to the test prescribed by the statute, no matter what is the nature of the public highway upon which the vehicle is being operated. We do not mean to be merely facetious or flippant when we observe that, if the defense contention in this respect were sanctioned and observed, there would be a singular dearth of "smooth, level road" situations in our great state to which such an instruction could be applied properly. The trial judge, over his signature on the instruction, made the following notation: "Instruction does not conform with the statute." On the contrary, the instruction appears to be substantially in the statutory language. We therefore feel that the plaintiff was entitled to an instruction dealing in proper form and language with the statutory provision in question, and that the trial court was not warranted in refusing the instruction on the basis of the reasons assigned for such refusal.

At the conclusion of the *voir dire* examination by the court of the panel of twenty jurors, counsel for the plaintiff requested the court in writing to inquire further of such jurors as follows: "If the plaintiff proves by a preponderance of the evidence that the defendant's fault caused the death of Arthur Henthorn and that the distributees of his estate, namely, Ara Henthorn, his wife, and Bonnie Henthorn, his daughter, suffered pecuniary damages or financial loss in the amount of $20,000, would you be willing to return a verdict for said amount?" The court refused to do so, and also refused to permit counsel to propound a similar inquiry, stating: "The Court sees no useful purpose of this inquiry, in view of the complete, thorough examination heretofore made of the jury, and the Court still feels that such inquiry at this time would only emphasize a possible total verdict and would serve no useful purpose in the trial of this case and might be to the prejudice of the defendant." We feel that the trial court acted with complete propriety in

this respect. This proposed inquiry seems to be a technique sometimes advocated as a means of inducing juries to return big verdicts. Courts are not interested in any device or technique designed to induce either large verdicts or small verdicts; but courts are under a solemn obligation at all times to keep the symbolic scales of justice delicately balanced so that every inducement will be held out to the jury, so far as mortal capacity permits, to render a *fair* verdict. If such an inquiry were propounded and answered in the affirmative by the twelve jurors ultimately selected for trial of the case, there might result a dangerous field for adroit and resourceful counsel in final argument to portray such affirmative answer as something in the nature of a tacit promise to return a verdict for the amount specified in the inquiry. We feel that the trial court, in refusing to propound such inquiry, exercised its discretion wisely in the interest of justice. The trial court, in the exercise of a sound discretion, may properly limit the extent of interrogation even in relation to any of the qualifications of jurors prescribed in Code, 56-6-12. *Carpenter v. Hyman,* 67 W. Va. 4, pt 2 syl., 66 S. E. 1078. While jurors may be interrogated on their *voir dire* within reasonable limits, to elicit facts to enable the litigants to exercise intelligently their right of peremptory challenge, the nature and extent thereof ''should be left largely to the discretion of the trial court.'' *State v. Stonestreet,* 112 W. Va. 668, pt. 1 syl., 166 S. E. 378.

The plaintiff complains of the refusal of the court to require the defendant on the plaintiff's motion to file a specification of defense in accordance with the provisions of Code, 56-4-20. While this case was tried prior to the effective date of the Rules of Civil Procedure for Trial Courts, we observe in passing that Rule 12(e) provides for a motion for a more definite statement of defense. The granting of such request, in accordance with the statutory provision, is within the sound discretion of the trial court, and this Court will not reverse for that cause unless it is clear that the par-

ty making such request has been prejudiced by the refusal of the trial court to grant it. *State v. Counts,* 90 W. Va. 338, pt. 3 syl., 110 S. E. 812; *State v. Greater Huntington Theatre Corporation,* 133 W. Va. 252, pt. 1 syl., 55 S. E. 2d 681. We perceive no error in the action of the trial court in this respect.

For the reasons stated herein, the plaintiff's motion to reverse is granted and sustained, the judgment of the Circuit Court of Wetzel Court is reversed, the verdict of the jury is set aside, and the plaintiff is awarded a new trial.

*Judgment reversed;*
*verdict set aside;*
*new trial awarded.*