Edmond Murphy, Appellee and Separate Appellee, v. Clarence H. Lindahl, et al, etc. Defendants below, Appellants.
Bernard Coffman, Defendant Below, Separate Appellant.

Gen. No. 47,687.

First District, Second Division.
February 16, 1960.
Rehearing denied March 29, 1960.
Released for publication March 29, 1960.

James B. McKeon and Andrew J. Farrell, of Chicago, for defendants-appellants.

Leo K. Wykell, and Fishman and Fishman, of Chicago (Albert E. Jenner, Jr., Philip W. Tone, Thomas P. Sullivan, and Thompson, Raymond, Mayer, Jenner, and Bloomstein, of counsel) for plaintiff-appellee.

PRESIDING JUSTICE MURPHY delivered the opinion of the court.

Plaintiff, an employee of the City of Chicago, sued the Lindahls and Bernard Coffman in a third party common law action, to recover for personal injuries suffered by him as a result of being struck by the bucket of a "Backhoe," a heavy-duty trench-digging machine, owned by the Lindahls, rented to the City, and operated by Coffman.

The jury returned a $250,000 verdict against the Lindahls and a not guilty verdict as to Coffman. Judgments were entered on both verdicts. On plaintiff's post-trial motion, the court entered judgment notwithstanding the verdict against Coffman, in favor of plaintiff, for the sum of $250,000. Post-trial motions of the Lindahls were denied. The defendants filed separate appeals.

The Lindahls, a father and son partnership, owned the "backhoe," which they rented to the City. The leasing agreement read: "Rental of . . . Backhoe . . . including hoisting engineer . . . ." On August 13, 1956, the "backhoe," operated by Coffman, was employed in digging a north and south sewer trench along Nashville Avenue in Chicago. Plaintiff was working in the trench. During an operation of the "backhoe," the bucket at the end of the hoisting

boom fell into the trench onto plaintiff, and he was badly injured.

Defendants contend Coffman, as operator of the "backhoe," was a servant of the City of Chicago under the "loaned servant doctrine," and was a fellow employee of plaintiff, and therefore, plaintiff had no common law remedy against any of the defendants.

On August 7, 1956, Lindahl, Sr., called the union hiring hall of Local 150, to hire an engineer to operate the "backhoe." Coffman, who has been an operating engineer since 1937, and a member of Local 150, was sent by the Union directly to the job, reported to the foreman and commenced work on August 8, 1956. He did not see the Lindahls until after the occurrence. From the time Coffman started to work and until plaintiff was injured, there were only six men working on the job—five City employees, plaintiff Murphy, McDonough, Dates, Volchko and Tunno, the foreman, and defendant Coffman.

Coffman received orders and directions from either Tunno, the foreman, or from Ralph McNamara, a superintendent in the Chicago Bureau of Sewers, who was on the job intermittently. The first day Coffman worked, Tunno complained to McNamara about the manner in which Coffman operated the machine in digging the trench. McNamara called Clarence Lindahl, Sr., and requested Coffman be replaced because he "was not suitable for the job." Later the same day, McNamara again telephoned Lindahl, Sr., and said "leave Mr. Coffman right on the job. He's real fine." After the occurrence on the 13th, Lindahl replaced Coffman at McNamara's request.

The machine was controlled entirely by Coffman, with the City employees telling him, by hand signals, where to dig the trench, how wide and how deep, and where to place the dirt. No person on the job, other

than Coffman, had anything to do with the operation of the machine or its performance, which was not so in Allen-Garcia Co. v. Industrial Commission, 334 Ill. 390, on which defendants rely heavily. Even though the City had the right to demand that he be replaced or to stop the machine, it had no right to discharge him or to substitute an operator in his stead, and this was never attempted. No City employee had any control or direction of Coffman in the actual operation of the "backhoe" or the manner of accomplishing the end result, digging of a trench.

We believe the facts in this case are very similar to those in Merlo v. Public Service Co. of Northern Illinois, 313 Ill. App. 57 (1942), where a steam crane was used in the construction of a sewer, and two men were electrocuted on the job. We do not believe that the proof here conclusively shows that Coffman surrendered the manner in which the machine should be operated or that he was for the time wholly subject to the control and direction of the City, to whom he was lent for the special service being performed, and freed during such time from the direction of his master. (Allen-Garcia Co. v. Industrial Commission, 334 Ill. 390, 394.) We think the question of whether Coffman was a loaned servant was for the jury. (Densby v. Bartlett, 318 Ill. 616; Standard Oil Co. v. Anderson, 212 U. S. 215; Louis v. Youngren, 12 Ill.App.2d 198.) We need not discuss cases cited from other jurisdictions, since the Illinois law has settled the point raised.

The contention of defendants Lindahl that the judgment entered on the not guilty verdict in favor of Coffman was *res adjudicata* and bars recovery by plaintiff against the Lindahls for the same cause of action (Hayes v. Chicago Telephone Co., 218 Ill. 414, 417, (1905); Rogina v. Midwest Flying Service, Inc., 325 Ill. App. 588, 593 (1945)) has no merit if the

467

trial court properly granted plaintiff's post-trial motion for judgment against Coffman notwithstanding the verdict.

■ The post-trial motion was filed in apt time and states that Coffman was in default for want of an appearance and answer. If the situation presented to the court properly called for a judgment notwithstanding the verdict, it was the court's duty to grant the motion and enter a proper judgment. (Section 68.-1(2), Civil Practice Act.) [Ill Rev Stats 1959, c 110, § 68.1(2).] Where the decision of the lower court is correct, the reasons acted upon by it are immaterial. Brown v. Atwood, 224 Ill. App. 77, 83; Robinson v. Workman, 9 Ill.2d 420, 425 (1956).

Coffman was not represented by counsel, filed no answer and did not participate in the trial as a party litigant. He was in default, but no default order was entered. Plaintiff called him as a witness under Section 60, and he also testified on behalf of the defendants as one of the defendants in the case. His testimony shows that in responding to a signal by someone to move the "backhoe," he moved the machine so that the bucket came off the spoil bank, and while the bucket was in the air, the "backhoe" started to travel and the cab started to swing around. There were five or six men standing around, "which the bucket would hit, if it kept swinging, and evidently the brakes didn't lock, and the bucket fell. . . . Whether I didn't stomp them (brakes) hard enough, I don't know, and I don't think anyone else does." He denied telling anyone that his foot slipped off the brake but admitted he "thought he had locked the brake," and when he took his foot off the brake to put it on "another pedal," the boom and bucket came down.

The "backhoe" is a heavy-duty digging machine, with a rotating cab mounted on caterpillar tracks. It has a boom, a bucket arm and a bucket, which turn with the cab. There are two cables, which wind

468

around two diesel-powered drums, controlled by clutches. There are four brakes—two controlling the drums (boom brake and bucket brake), a third controlling the rotating movements of the cab (cab brake), and the fourth controlling the forward and backward movement of the "backhoe" (track brake). Each drum brake has a locking device to hold the drum stationary. The locking device functions by means of a spring clip on the side of the brake pedal, so as to keep the brake depressed and functioning until the lock is released. The "backhoe" requires a skilled operator, capable of using both hands and feet, with full co-ordination of mind and body.

The fact that the entire machine started to move after he put the boom in motion reasonably shows that the track brake was not properly locked, and the dropping of the bucket reasonably shows that the bucket brake was not properly locked. His statement that he "thought it was locked," or that he did not "stomp them hard enough," is indicative of his undisputed inept or careless handling of the machine. Coffman offered no evidence to show that the failure of the brakes to lock was due to a mechanical failure and not his lack of due care. The record contains no evidence to show that the City crew members were, either directly or inferentially, guilty of any negligence which contributed in any degree to the dropping of the bucket. Plaintiff was where he should have been, and the record reflects nothing to show any negligence on his part.

 The question presented by plaintiff's motion was whether there was any evidence in the record which, when viewed in its aspect most favorable to defendant, fairly tended to prove a defense to the cause of action. (Weinstein v. Metropolitan Life Ins. Co., 389 Ill. 571, 576; Hadden v. Fifer, 339 Ill. App. 287, 291.) We conclude the record justified the court in finding there was no evidence of a defense in Coff-

man's favor and in granting the post-trial motion for judgment against Coffman, notwithstanding the verdict and judgment in his favor.

■ It was not necessary for the court to have impaneled another jury to assess the damages against Coffman. (Civil Practice Act, § 71.) Plaintiff's damages were assessed by the jury in the verdict returned against the Lindahls, and the measure of damages against Coffman was the same.

Complaint is made of error during the voir dire. Plaintiff's attorney sought to elicit answers showing the attitude of the prospective jurors toward returning a $300,000 verdict, the amount sued for. One woman answered that under no circumstances would she affix her name to such a verdict. One man answered, "I would not sign a verdict. I don't think the injury would be worth $300,000.00." Questions were asked of the female prospective jurors as to how they might react to evidence showing the crushed and bleeding leg of plaintiff. One woman was excused for cause, because she said such evidence would make her sick.

■■ Plaintiff was entitled to a voir dire examination sufficient to show that each juror accepted was free from bias, prejudice or an opinion implying a prejudgment of the case, which would not readily yield to contrary evidence, so that he could fairly and impartially try the case according to law and the evidence, and render a true verdict. Questions which are designed to obtain a pledge from the prospective juror as to how he would decide the case on an assumed state of facts, or to obtain a statement showing which party he would favor in a supposed state of the evidence, are improper. People v. Robinson, 299 Ill. 617, 619; People v. Wiggins, 231 Ill. App. 467, 477.

■ The instant record shows that some prospective jurors may have had fixed opinions, which indicate bias or prejudice against large verdicts, and which might not readily yield to proper evidence.

470

Questions which tend to be gruesome and inflammatory should be avoided, but again the instant case demonstrates that it is possible for a prospective juror to be so sensitive to some evidence as to make effective and impartial jury duty improbable. We see no abuse of discretion in the instant case. Also, we see no error in the court saying, "Step out of the jury box," in excusing prospective jurors.

Plaintiff was fifty-one years old at the time of the occurrence and had a life expectancy of about twenty-two years. Prior to the occurrence he was a normal, healthy man, with no condition of illness or infirmity, and in 1955 he earned $19.40 per day and grossed $5,614.75. At the time of the trial his special damages had amounted to about $15,000. Testimony shows that he was suffering from loss of his left leg just below the knee; osteoporosis (shrinkage and atrophy) of what remained of his left leg; persistent and continuing pain in the left leg; a painful condition in his chest, resulting from the impingement of the intercostal nerves that run beneath the second and third ribs, which had been fractured; a post-concussion syndrome, which included positional nystagmus, indicating damage to the central nervous system; recurring dizzy spells, and constantly upset stomach. Presumably his punctured lung had healed, and he had a scalp scar three and one-half inches long and one-eighth inch wide. There was medical testimony that his head, brain damage and lung injuries might or could be permanent. It was undisputed that his left leg needed further surgery.

 Defendants argue that plaintiff should be able to earn fifty per cent of what he was capable of earning before the occurrence. We think this is most speculative. A nystagmus indicates that the nervous mechanism has been disturbed and "the patient does not have a normal equilibrium." This condition, coupled with a constantly upset stomach and an ar-

471

tificial limb used for walking, would make any kind of steady employment rather dubious. This was a jury question.

The testimony of the City crew members gave the shocking details of plaintiff's plight as he lay in the trench. He was in terrible agony, screaming with pain, part of his leg hanging off, with blood coming through his pants, and his head seriously cut. McDonough testified he "couldn't take any more," went home and took a leave of absence.

This description undoubtedly aroused a normal emotional reaction on the part of the jury. We think, therefore, that the information improperly given as to plaintiff's family, the reference to insurance in the testimony, or even the admission of gruesome colored photographs, which we believe did not tend to prove any material issue, did not aggravate the emotional reactions of the jury, sufficient to warrant a reversal for prejudice.

Plaintiff was entitled to substantial damages and reasonable men might differ as to the amount. We believe all parties were given a fair trial, without prejudicial error, and we find no basis to depart from the usual rule that the assessment of damages is the pre-eminent function of the jury. (Kahn v. James Burton Co., 5 Ill.2d 614.) Considering plaintiff's expenditures, past and future, lost wages, pain and suffering, and his life expectancy, we think the verdict is within the reasonable scope of the evidence and is not so clearly excessive as to require this court to disturb it. Goertz v. Chicago & N. W. Ry. Co., 19 Ill.App.2d 261.

We turn to the other contentions of defendants Lindahl. Plaintiff, in asserting his common law action against a third party, was not required by the Workmen's Compensation Act to prove that the City and its employees were free from negligence. (Rylander v. Chicago Short Line Ry. Co., 17 Ill.2d 618

(1959).) Also, the court was correct in denying the motion to strike or withdraw specified subparagraphs of the complaint from the consideration of the jury. We believe there was sufficient evidence as to all except "E" and, as to this, we fail to see that it was prejudicial.

■ ■ We have examined the instructions tendered and refused. It is sufficient when the instructions, considered as a whole, substantially present the law of the case fairly to the jury. (Bunton v. Illinois Cent. R. Co., 15 Ill.App.2d 311, 330.) We believe the given instructions substantially stated the law and were adequate for the various issues presented in this case. The special interrogatory which was given to and answered by the jury is consistent with the verdict against the Lindahls and with the judgment notwithstanding the verdict against Coffman. The court was correct in denying the post-trial motions of the defendants Lindahl.

Finding no reversible error in the proceedings, the judgments against both of the Lindahls and Bernard Coffman, in favor of plaintiff, for the sum of $250,-000, are affirmed.

Affirmed.

KILEY, J., concurs.

BURMAN, J., took no part.