BUNDA v. HARDWICK.

DECISION OF THE COURT.

1. DEATH—MULTIPLE AUTOMOBILE COLLISIONS.
   Judgment for plaintiff executrix of the estate of her deceased husband who was killed as the result of multiple automobile collisions is affirmed in action under death act (CL 1948, § 691.581 et seq.).

DISSENTING OPINION.

T. M. KAVANAGH, C. J., and DETHMERS and SOURIS, JJ.

2. DAMAGES—PROBABILITY—POSSIBILITY.
   *The law is concerned only with the* probability *of future events and not their mere* possible *occurrence, when assessing damages.*

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 22 Am Jur 2d, Death §§ 2, 12, 14.
[2] 22 Am Jur 2d, Damages §§ 22, 23, 26.
[3] 22 Am Jur 2d, Damages § 22.
[4] 22 Am Jur 2d, Death § 164.
   Remarriage of surviving spouse, or possibility thereof, as affecting action for wrongful death of deceased spouse.   87 ALR2d 252.
[5, 6] 53 Am Jur, Trial § 137.
[7] 31 Am Jur, Jury § 138.
[8, 13, 14] 31 Am Jur, Jury §§ 129, 136, 171, 212.
[9] 31 Am Jur, Jury §§ 146, 147, 150, 229.
[10] 31 Am Jur, Jury § 141.
[11] 31 Am Jur, Jury §§ 146, 150.
[12] 31 Am Jur, Jury §§ 138, 151–153.
[15, 25] 53 Am Jur, Trial § 967.
   38 Am Jur, Negligence § 343.
[16–19] 53 Am Jur, Trial §§ 860, 905.
[17] 53 Am Jur, Trial § 910.
[20] 22 Am Jur 2d, Death §§ 2, 18, 31.
[21] 22 Am Jur 2d, Death §§ 31, 32.
[22] 22 Am Jur 2d, Death § 266.
   8 Am Jur 2d, Automobiles and Highway Traffic § 1025.
[23] 22 Am Jur 2d, Death §§ 215, 266.
[24] 5 Am Jur 2d, Appeal and Error §§ 555–557.

3. COURTS—PRECEDENTS—DAMAGES.

*A court should not announce a new and radical rule of damages without careful and definitive statement of its reasons for doing so.*

4. DEATH—DAMAGES—EVIDENCE—REMARRIAGE.OF SPOUSE.

*Remarriage of surviving wife, or the possibility thereof, is irrelevant in action under the death act for death of husband, hence, evidence of the wife's remarriage, or the probability of her remarriage, was properly excluded in determining damages (CL 1948, § 691.581 et seq.).*

5. TRIAL—OBJECTIONS.

*An objection to the rulings or orders of the court during the course of trial must be so made as to state the grounds for the objection in sufficient detail to inform not only the circuit judge, but also opposing counsel, precisely what defect is claimed (GCR 1963, 507.5).*

6. SAME—INDEFINITE OBJECTION—VOIR DIRE EXAMINATION.

*Objection that there was "improper interrogation on voir dire examination" held, too indefinite, since it neither sufficiently identifies what portion of the interrogation is objectionable nor does it specify in what respects it is challenged as improper (GCR 1963, 507.5).*

7. JURY—VOIR DIRE EXAMINATION.

*The scope of voir dire examination is largely within the discretion of the trial judge.*

8. SAME—VOIR DIRE EXAMINATION—QUESTIONING AS TO SIZE OF VERDICT.

*Refusal of trial court to sustain defendant's objection to questioning on voir dire examination of jury by plaintiff's counsel relative to amount of verdict which would be sought held,. proper, where counsel sought from jurors only their assurance they would not be unwilling to award the full amount of damages proved to be due plaintiff, even if such proof might indicate plaintiff was damaged in the amount of $150,000, the full amount for which suit was brought, and even if objection had not been too indefinite.*

9. SAME—CHALLENGES.

*A litigant's right to trial before an impartial jury requires that he be given an opportunity to obtain the information necessary to challenge individual jurors for cause of peremptorily (GCR 1963, 511.4).*

10. SAME—VOIR DIRE EXAMINATION—PREJUDGMENT.
     Questions to jurors on voir dire examination, which are designed
       to obtain a pledge from the prospective juror as to how he
       would decide the case on an assumed state of facts, or to
       obtain a statement showing which party he would favor in a
       supposed state of the evidence, are improper.

11. SAME—CHALLENGE FOR CAUSE.
     A juror is subject to challenge for cause where it is shown he
       has a state of mind which will prevent him from rendering a
       just verdict or has formed a positive opinion on the facts of
       the case or as to what the outcome should be, or has opinions
       or conscientious scruples which would improperly influence his
       verdict (GCR 1963, 511.4).

12. SAME—VOIR DIRE EXAMINATION—DISCRETION OF COURT.
     Allowance or denial of a particular inquiry on voir dire exami-
       nation constitutes reversible error only where the wide measure
       of discretion lodged in the trial judge has been abused.

13. SAME—SIZE OF VERDICT—PREJUDICE—VOIR DIRE EXAMINATION.
     Possible prejudice against large verdicts is a matter as to which
       the trial court can properly permit inquiry on voir dire exami-
       nation, so long as the question is not so phrased as to amount
       to an attempt to pledge the juror to a particular award.

14. SAME—VOIR DIRE EXAMINATION—SIZE OF VERDICT.
     A fair trial is predicated upon an impartial jury, and to deny
       plaintiff the right to make inquiry on voir dire examination
       as to whether jury would return a verdict in the large amount
       claimed, if proved, might subject him to a jury prejudiced
       against awarding him what lawfully may be due him, all
       subject to instructions at the time of the voir dire as well
       as in the formal charge that such voir dire inquiries are in no
       way binding upon them as a pledge to return the large amount
       claimed.

15. INSURANCE—MISTRIAL.
     Motion for mistrial was properly denied, where question to wit-
       ness was not such as to call for any statement from the witness
       as to insurance, no attempt was made by counsel for plaintiff
       to make any use of the statement concerning insurance, and
       it does not appear that the matter was designedly injected into
       the case (CLS 1961, § 500.3030).

16. SAME—MISTRIAL—CONVERSATION BETWEEN JURY AND COURT OF-
     FICER.
     Conversations between jury and court officer, which occurred dur-
       ing course of trial of action for wrongful death and which

*in one instance concerned insurance, held, to have required that defendant's motion for mistrial should have been granted (CL 1948, § 691.581 et seq.; CLS 1961, § 500.3030).*

17. JURY—EVIDENCE.
*A jury is summoned to decide a case solely upon the basis of testimony and other evidence presented in open court.*

18. SAME—COURT OFFICER—OUTSIDE INFLUENCES.
*The court officer who is put in charge of a jury to prevent, as far as practicable, outside sources from influencing its verdict, should not be permitted to be the source of such influence.*

19. SAME—COURT OFFICER.
*A court officer should not converse with the jurors at any time, except as necessary to direct them where to go and when, and he should not make any comment upon the case being tried or its conduct, although permitted to take to the judge any written questions the jurors may have.*

20. DEATH—SUCCESSIVE ACCIDENTS—PROXIMATE CAUSE.
*Action for death of plaintiff's decedent was properly brought under the wrongful death act, where decedent died as a result of successive accidents and there was evidence that appellant's alleged negligence so injured the decedent as to be a substantial factor in bringing about the fatal injuries (CL 1948, § 691.581 et seq.).*

21. SAME—SUCCESSIVE INDEPENDENT ACCIDENTS.
*Death of plaintiff's decedent as result of being injured when hit by appellant's car and rendered unconscious and then shortly thereafter hit by another defendant's car and then found to be dead held, to have rendered both defendants liable under the death act (CL 1948, § 691.581 et seq.).*

22. AUTOMOBILES—SPEED—INSTRUCTIONS.
*Instruction given in death case as to appellant defendant's duty so to drive as to be able to stop within the assured clear distance ahead held, not reversibly erroneous, when the charge dealing with the matter is read in its entirety (CLS 1961, § 257.627).*

23. DEATH—PRESUMPTION OF DUE CARE—EVIDENCE—INSTRUCTIONS.
*Instruction given respecting presumption of due care on part of decedent who was killed as a result of successive accidents occurring at about 7:30 p.m. late in March on a 3-lane highway held, not to have been in error, where the evidence was not such as to have precluded jury from finding decedent was*

*free from contributory negligence at time he was struck by appellant defendant's car.*

24. APPEAL AND ERROR—MOTION FOR NEW TRIAL—SAVING QUESTION FOR REVIEW.
*Failure to make a motion for new trial did not effect a waiver of questions as to admissibility of evidence, claimed error in instructions, or denial of mistrial, where appellant had secured a ruling by the trial court during the proceedings below.*

SEPARATE OPINION.

KELLY AND O'HARA, JJ.

*See headnotes 2–15, 19–24.*

25. INSURANCE—MISTRIAL—CONVERSATION BETWEEN COURT OFFICER AND JURY.
*Conversations between court officer and jurors, during course of trial, held, not to have disclosed the conveyance of any information which could possibly have influenced the jury and especially not to have suggested that defendant appellant was or was not insured, hence, motion for mistrial made a week later was properly denied (CLS 1961, § 500.3030).*

SEPARATE OPINION.

SMITH and ADAMS, JJ.

*See headnotes 2–15, 17–25.*

Appeal from St. Clair; Streeter (Halford I.), J. Submitted May 13, 1965. (Calendar No. 32, Docket No. 50,422.) Decided December 7, 1965. Rehearing denied February 8, 1966.

Case by Anna Jacqueline Bunda, administratrix of the estate of Charles Stanley Bunda, against Harry N. Hardwick and Llwellyn Brown, Jr., under the death act for damages on death of husband run over on pavement following multiple automobile collisions. Verdict and judgment for plaintiff. Defendant Hardwick appeals. Affirmed.

*Walsh, O'Sullivan, Stommel & Sharp,* for plaintiff.

*Bush, Luce, Henderson & Black* and *Smith, Brooker, Harvey & Cook,* for defendant Hardwick.

*Amicus Curiae:*

*Cicinelli, Mossner, Majoros & Harrigan* (*Peter F. Cicinelli* and *Eugene D. Mossner,* of counsel), advocating rule of inadmissibility of remarriage evidence in wrongful death action.

SOURIS, J. (*for reversal*). Plaintiff Bunda brought suit under the wrongful death act, CL 1948, § 691.581 *et seq.* (Stat Ann 1959 Cum Supp § 27.711 *et seq.*),[1] against defendants Hardwick and Brown for damages arising out of the death of her husband. On March 27, 1960, at about 7:30 p.m., Mr. Bunda was driving a station wagon northeasterly on three-lane highway US 25 in St. Clair county, when he collided, in the center lane, with the rear of an automobile being driven by Michael Rycerz. No one was injured by this collision.

Mr. Rycerz drove his vehicle off the highway, but the engine of Mr. Bunda's station wagon could not be started and, therefore, that vehicle was not then moved off the highway. It remained approximately in the center lane, facing northeasterly.

While Mr. Bunda was standing near his disabled vehicle (and, according to some witnesses, within the light from its headlights), it, he, and Mr. Rycerz were struck by an automobile driven by defendant Hardwick, who was traveling southwesterly. Mr. Bunda was rendered unconscious and was bleeding from the nose, but there was evidence offered at trial that he was still alive after this second collision. However, Mr. Bunda was shortly thereafter

---

[1] See, currently, CLS 1961, § 600.2922 (Stat Ann 1962 Rev § 27A.2922).

run over by defendant Brown's northeasterly bound vehicle and, when next examined, was dead.

Defendant Brown was defaulted prior to trial for failure to respond to a summons. At trial the jury returned a verdict of $90,000 against defendants Brown and Hardwick, and Mr. Hardwick alone appeals.

Appellant's claimed errors may be grouped into two general categories: Those relating to the trial itself, and those relating to the circuit judge's jury instructions. We shall consider them in that order.

## I.

## A.

Mr. Hardwick argues that the circuit judge erred in refusing to permit him to introduce a certificate of birth of a child born to Mrs. Bunda from which he claims the jury might have inferred that Mrs. Bunda had remarried. He relies upon *Jones v. McMillan* (1901), 129 Mich 86; *Hewitt v. East Jordan Lumber Co.* (1904), 136 Mich 110; *Sipes v. Michigan Central R. Co.* (1925), 231 Mich 404; and *Stuive v. Pere Marquette R. Co.* (1945), 311 Mich 143, all of which were cited in *Wechsler v. Mroczkowski* (1958), 351 Mich 483, as authority for the proposition that remarriage acts to mitigate or bar damages in actions brought under the wrongful death act for the death of a spouse. That proposition was not in issue in *Wechsler* and was mentioned therein only in rejection of the suggestion that the rationale behind such proposition, by analogy, be extended by this Court to permit proof of the adoption of a decedent's minor children after decedent's death in bar or mitigation of the infants' claim for damages for the wrongful death of their parent. We there said (p 489):

"No cases relating to barring or mitigation of damages by post-death adoption are cited to us. We are asked by counsel for appellee to extend to the instant situation the Michigan cases wherein Michigan, among a small minority of the States, has held that remarriage of a spouse acts to mitigate or bar damages under the statute pertaining to actions for wrongful death. *Jones* v. *McMillan,* 129 Mich 86; *Hewitt* v. *East Jordan Lumber Co.,* 136 Mich 110; *Sipes* v. *Michigan Central R. Co.,* 231 Mich 404; *Stuive* v. *Pere Marquette R. Co.,* 311 Mich 143.

"This we decline to do. On grounds of public policy, we decline to hold post-death adoption as a bar to a child's claim for pecuniary injury due to the wrongful death of a parent. Such a rule would sanction a substantial economic barrier to adoption of children wrongfully orphaned.

"Further, in Restatement of Torts we find this statement of the rule:

" 'The fact that support, education or other gratuities have been received from third persons, although induced by the death, or that the survivors will be cared for by third persons, does not mitigate the damages.' 4 Restatement, Torts, Damages, § 925*h*."

While it is true that *Jones, Hewitt, Sipes,* and *Stuive* collectively seem to commit Michigan, exclusively among the States, to a radical rule permitting proof of remarriage in bar or mitigation of a widow's damages in a suit for the wrongful death of her spouse, their precedential value is dubious. In the first place, the "rule" when first applied by this Court seems to have had its genesis, in 1925 in the *Sipes Case,* as the result of a mistaken reading of some rather cryptic language which appeared in 1901 in the *Jones Case.* Second, in none of the four cases relied upon by the appellant was any reasoned consideration given to the so-called "rule". Third, the rule, if it be that, patently is inconsistent with

this Court's reasoning in a directly related matter, the exclusion of evidence of payments from a collateral source in bar or mitigation of damages for negligent injury or wrongful death. The first two reasons stated for regarding the "rule's" precedential value of dubious force can be considered together in a review of the four cases relied upon in support of it; the "rule's" inconsistency with our collateral source rule will be considered subsequently.

The first suggestion that this Court should approve a jury's consideration of the probability[2] of the remarriage of a widow suing for damages for the wrongful death of her husband occurred in 1904 in the *Hewitt Case.* There, this Court affirmed a jury verdict in favor of the plaintiff widow. During the trial the jury was instructed that the widow's life expectancy was 26 years according to the mortality tables, and it was also instructed, however, that she might not live that long. On appeal, defendant's attorney claimed that the circuit judge also should have told the jury that it could consider the "possibility" of the widow's remarriage in assessing her damages and cited, in support of his claim, the case of *Jones* v. *McMillan, supra.* This Court, without so much as suggesting even its agreement with defense counsel's reliance upon the *Jones Case,* refused to consider the defendant's claim on appeal simply because defendant's counsel had failed to make any requests to the circuit judge for any instructions relating to the use to which the jury might put mortality tables. Thus, it can hardly be claimed

---

[2] Throughout the cases which discuss this issue, reference is made to the "possibility" of remarriage, suggesting, it seems to me, that the jury might be permitted on this unique occasion to speculate about such "possibility". I fail to see why such an issue, even if otherwise appropriate for jury consideration, should merit deviation from the law's traditional concern only with the *probability* of future events and not their mere possible occurrence.

that this Court in *Hewitt* anounced any such rule
as we are asked on this appeal to apply.

Turning now to the *Jones Case* upon which re-
liance was placed by the defendant's counsel in the
*Hewitt Case* on appeal, we find that this Court re-
versed a jury verdict in favor of plaintiff whose
husband was found to have been wrongfully killed
in defendant's service. While the case was reversed
for several prejudicial errors not pertinent hereto,
this Court planted its reversal also on the ground
that the circuit judge erroneously instructed the
jury that it was bound to determine damages on
the basis of the probable support decedent would
have contributed to his widow during her life ex-
pectancy as shown in the mortality tables and to
his children until they attained age 21, which in-
struction was given without any of the customary
limitations such as the probability of the widow's
or of the children's death prior to the stated ages, the
probability of changes in decedent's earning capacity
had he not been wrongfully killed and the probability
of the emancipation of the minor children by mar-
riage prior to their attaining the age of 21. After
quoting the charge as given erroneously by the
circuit judge, this Court added the following short
paragraph of discussion, which defense counsel in
*Hewitt* seized upon and which, I submit, this Court
misconstrued in *Sipes,* as I hope later to demon-
strate:

"The jury would naturally award damages for the
entire expectancy, as shown by the tables, for the
widow, and up to the age of 21 for each child, without
considering the possibilities of death, marriage, and
earning capacity of deceased in either case." 129
Mich 86, 91.

The use of the word "marriage" in the above pas-
sage is, as I view the cases, the cause of our subse-

quent difficulty. Defense counsel in *Hewitt* seized upon the unqualified use of the word to argue to this Court in *Hewitt* that it referred to the widow's marriage after the decedent's death and so, too, did this Court construe that word and that curt passage in *Sipes*. However, it seems highly unlikely to me that this Court would in such an oblique way announce a new rule in Michigan, particularly one so radical, without careful and definitive statement of its reasons for doing so. It seems far more likely to me that this Court, when it spoke as quoted above in *Jones,* meant only that the jury should have been permitted to consider, in mitigation of plaintiff's damages, the probability of her death before the end of her normal life expectancy or the death of any or all of the surviving minor children prior to their attainment of the age of 21, or of the marriage of any of the children before attainment of age 21 and, as well, fluctuations in the earning capacity of decedent had he lived. Such a reading of the quoted passage, particularly its reference to the matter of marriage, limiting that reference to the "possible" marriage only of the surviving children of decedent, is entirely consistent with the law as it existed prior thereto. See *Rouse* v. *Detroit Electric Railway* (1901), 128 Mich 149, and *Ormsbee* v. *Grand Trunk W. R. Co.* (1917), 197 Mich 576.

In 1925, when *Sipes* was decided, this Court seems finally to have adopted the contention made futilely by defense counsel 21 years earlier in *Hewitt*. In *Sipes,* this Court reversed a judgment in favor of plaintiff widow. Among the errors discussed by the Court was defendant's claim that the jury should have been instructed to consider the "possibility" of the widow's remarriage in assessing her damages. The entire discussion of this Court on that point is set forth herewith:

"The widow was 21 years of age at the time of the trial and defendant requested the court to instruct the jury to consider, in fixing the period of loss of support, the possibility of her remarriage. This was covered by the tenth request and was not given, nor the substance thereof included in the charge. The possibility of so young a person contracting another marriage should have been permitted to temper the thought of celibacy for 39 years. *Jones* v. *McMillan,* 129 Mich 86." 231 Mich 404, 407.

The *Sipes Case* is interesting for at least two reasons. First, of course, is the Court's planting the relevance of the jury's consideration of the "possibility" of remarriage upon *Jones* v. *McMillan,* which as we have seen, gave no reasoned attention to the issue nor, it is apparent, did the Court in *Sipes*. Second, while the Court found the award to Flossie Sipes of $15,166.66 excessive because based "upon a mere speculative supposition of increase in earnings under problematical future opportunities" (231 Mich 404, 406), the question of a "possible" remarriage of Mrs. Sipes, and presumably, the "possible" benefit to her therefrom, was considered not too speculative a ground for reducing any damages the jury might otherwise find should be awarded.

The fourth case in which this issue has been before this Court is *Stuive, supra,* decided in 1945. In that case plaintiff had remarried at the time of suit to recover damages for the wrongful death of his first wife. Defendant objected that plaintiff had been awarded damages for loss of the household services of his deceased wife for a period even after plaintiff's remarriage when, presumably, his new wife performed such household services for him. This Court's entire discussion of the issue, in *Stuive,* covers four lines of our reports:

"We have examined the instructions given the jury

and conclude that they were informed that the loss of the wife's services as a housekeeper was limited in time up to the time of plaintiff's remarriage." 311 Mich 143, 151.

Thus it is seen that the rule we are asked to apply has its origin in a shorthand expression casually delivered by the Court in *Jones* in 1901 and mistakenly adopted as a rule of law by this Court in *Sipes* in 1925, and only twice thereafter, in *Stuive* in 1945 and in *Wechsler* in 1958, even having been mentioned by this Court. Furthermore, in none of the cases cited was any reasoned thought given by this Court to the question of relevance of evidence of remarriage, or of evidence of the *probability* thereof, to the damages sustained as the result of the death of a spouse. Had such thought been given to the question of relevance, I am convinced that the "rule" never would have been adopted, not alone because no rational argument can be made that such evidence is relevant, but also because such "rule" would be at war with established principles of Michigan law regarding the admissibility of evidence in mitigation of damages, and, as well, with evidentiary principles adopted by other jurisdictions which have considered the question.

In *Motts* v. *Michigan Cab Co.* (1936), 274 Mich 437, cited with approval in *Royer* v. *Eskovitz* (1960), 358 Mich 279, and *Canning* v. *Hannaford* (1964), 373 Mich 41, this Court considered whether an employer's payments to an injured employee, plaintiff, when he was unable to work, would bar or mitigate his recovery from the defendant tort-feasor for loss of earnings. We concluded that such payments would not, reasoning thusly:

"This doctrine is evidently analogous to that followed generally throughout the courts of this country, that a recovery of damages for loss, injury or

death, from a tort-feasor, is not barred by the receipt by the injured or his beneficiaries of money paid by an insurance company on an insurance policy for the same respective loss, injury, or death.

"In *Roth* v. *Chatlos,* 97 Conn 282, 287, 288 (116 A 332, 22 ALR 1554), the court said:

" 'Evidence was also excluded, and properly, that the plaintiff was insured against loss from the payment of a hospital bill incurred in the effort to cure the injuries suffered through the negligence of defendant.

" 'The authorities, both numerically and in weight, agree that a defendant owes to the injured compensation for injuries the proximate cause of which was his own negligence, and that their payment by third parties cannot relieve him of this obligation, and that, whether the motive impelling their payment be affection, philanthropy, or contract, the injured is the beneficiary of their bounty and not him who caused the injury. In short, the defendant has no equitable or legal claim to share in the amount paid for the plaintiff. The majority rule of the cases is that an injured person is entitled to recover as damages for reasonable medical, hospital, or nursing services rendered him, whether these are rendered him gratuitously or paid for by his employer. Such service or such payment is for the benefit of the injured person. It is a gift to him. But since it is one of the elements of injury, he is entitled to recover the reasonable value of the service.' " 274 Mich 437, 444, 445.

See, also, 4 Restatement, Torts (1939), § 920, which states the general rule as follows:

"Where the defendant's tortious conduct has caused harm to the plaintiff or to his property and in so doing has conferred upon the plaintiff a special benefit to the interest which was harmed, the value of the benefit conferred is considered in mitigation of damages, where this is equitable."

Comment *e* to that section provides this significant
and pertinent qualification:

"The rule stated in this section does not apply
where, although a benefit is received because of the
harm, such benefit is the result of the forethought of
the plaintiff or of a gift to him by a third person.
The plaintiff is not barred from recovery merely
because he suffers no net loss from the injury, as
where he is insured or where friends make contribu-
tions to him because of the loss. If his things are
tortiously destroyed, the insurance carrier is sub-
rogated to his position. In other cases the damages
which he is entitled to recover are not diminished
by the fact that, either as a matter of a contract right
or because of gifts, the transaction results in no loss
to him. Where a person has been disabled and hence
cannot work but derives an income during the period
of disability from a contract of insurance or from a
contract of employment which requires payment
during such period, his income is not the result of
earnings but of previous contractual arrangements
made for his own benefit, not the tort-feasor's.
Likewise, the damages for loss of earnings are not
diminished by the fact that his employer or a third
person makes gifts to him even though these have
been given because of his incapacity. Further, he
may be able to recover for the reasonable value of
medical treatment or other services made necessary
by the injury although these have been donated to
him."

If a defendant cannot show the certain benefit
accruing from receipt of insurance as a mitigation
of damages (*Motts, supra*) and if post-death adop-
tion of a decedent's minor children neither bars nor
mitigates their claim for damages for the wrongful
death of their parent (*Wechsler, supra*), it is quite
illogical to permit a defendant to show either that
plaintiff has remarried or, worse, that because she
is young and attractive, she *might* sometime in the

future remarry. We think the proper rule is stated in *The City of Rome* (SD NY 1930), 48 F2d 333, cited with approval in *Wechsler, supra,* wherein the court denied defendant the right to go into the question of remarriage, approving this language of a commissioner in admiralty:

"I have not stopped a widow's pecuniary loss at the date of her remarriage. It would be pure assumption to do so; there is no evidence before me to indicate whether she is as well off pecuniarily, or better or worse, by reason of her remarriage. Nor do I think that any such consideration would be relevant. It may often happen that, by reason of inheritance, or insurance, or by reason of her own industry and superior capacity, a widow may be much better off pecuniarily after her husband's death than she had ever been in his lifetime. No one has ever suggested that such considerations must be taken into account in computing her pecuniary loss. Her remarriage is analogous. The fundamental question is, not her financial situation after her husband's death, but what she might reasonably have expected to receive from him had he lived." 48 F2d 333, 338.

The court then went on to say:

"If we should enter upon an inquiry as to the relative merits of the new husband as a provider, coupled with his age, employment, condition of health, and other incidental elements concerning him, unavoidably we should embark upon a realm of speculation and be led into a sea of impossible calculations." 48 F2d 333, 343.

In an annotation, "Remarriage of surviving spouse, or possibility thereof, as affecting action for wrongful death of deceased spouse", 87 ALR2d 252, 253 (1963), it is stated:

"All of the American jurisdictions which have considered the question, except Michigan, hold that the

surviving spouse's remarriage, or the possibility thereof, does not affect the damages recoverable in an action for wrongful death of the deceased spouse. Two reasons are offered in support of this rule: (1) the cause of action arises at the time of the decedent's death, and the damages are determinable as of the same time; and (2) the rule providing for mitigation of damages on account of the surviving spouse's remarriage is highly speculative, because it involves a comparison of the prospective earnings, services, and contributions of the deceased spouse with those of the new spouse."

I would hold that evidence of plaintiff's remarriage or the *probability* of her remarriage is irrelevant and, therefore, was properly excluded, in determining the damages she suffered upon the death of her spouse. Insofar as *Jones, Hewitt, Sipes, Stuive,* and *Wechsler, supra,* suggest the contrary, I would overrule them.

### B.

Appellant asserts prejudicial error was committed by the circuit judge in overruling his objection to what appellant characterizes as "the repeated effort of plaintiff's counsel to exact a pledge from prospective jurors to bring in a verdict for a large sum, namely $150,000." During the *voir dire* examination, plaintiff's counsel asked the jurors the following question:

"*Mr. Walsh:* Do any members of this jury panel * * * have any feeling in an action like this for a man's death, have any fixed thoughts or feelings as to an amount of a verdict that should be rendered or some top amount beyond which you would not be willing to go or feeling that there should only be a certain amount awarded; in other words, a limit that would arbitrarily impose in their mind on what the value ought to be put on the economic losses to this

family from the death of Mr. Bunda? In other words, in this case we have asked damages in the amount of $150,000. Mr. Bunda, I think you will find, was 37 years of age at the time of his death. Are there any members of the panel who would feel that no man's life would be worth $150,000?"

To this question defendant's counsel made only the following objection:

"*Mr. Bush:* Your Honor, for the record I would rise to make an objection that that is improper interrogation on *voir dire* examination."

In what respects counsel thought the quoted examination "improper", and on what specific ground he then desired the circuit judge to bar such inquiry, do not appear in the objection as made. We do not read GCR 1963, 507.5 to mean that an objection now may be made without stating grounds therefor in sufficient detail to inform not only the circuit judge, but also opposing counsel, precisely what defect is claimed. The mere assertion that "that is improper interrogation on *voir dire* examination" neither sufficiently identifies what portion of the interrogation is objectionable nor does it specify in what respects it is challenged as "improper". In short, defense counsel's objection was too indefinite.

"It presented to the mind of the court no distinct matter to be passed upon, and, in view of the circumstances, was very little, if any, better than no explanation at all; and the point does not appear to us to call for indulgent treatment." *Jennison* v. *Haire* (1874), 29 Mich 207, 211.

In the same case, the following apt statements appear:

"It [the objection] was too indefinite. The occasion required a distinct and suggestive statement. By that which was made the court was left in a state

of complete uncertainty respecting the specific defect relied on by the objecting party, and no other duty was raised than to overrule the objection." *Id.*, p 212.

"The precise and only ground on which the judgment entry was objected to was, that the judgment was not properly rendered. This objection, like others which have been noticed, was too general and unspecific to bind the court to entertain it. The objecting party, in view of the circumstances, should have so presented his point as to have drawn the attention of the court to the defect or difficulty complained of. This was not done, and there was nothing to indicate the subject pointed at." *Id.*, p 214.

On appeal, for the first time, defense counsel asserts that the quoted *voir dire* examination, to which he made his "for the record" objection, had as its improper objective the jurors' pledge to return a verdict for plaintiff in a stated amount. The assertion, untimely as it is, does not characterize fairly the quoted examination. Neither in what preceded the objection nor in what followed, significantly without further objection, did plaintiff's counsel seek to extract any pledge from the jurors. In his subsequent *voir dire* plaintiff's counsel sought from the jurors only their assurance that they would not be unwilling to award the full amount of damages proved to be due plaintiff even if such proof might indicate plaintiff was damaged in the amount of $150,000, the full amount for which suit was brought.

In *Spelker* v. *Knobloch* (1958), 354 Mich 403, this Court reiterated the principle that the scope of *voir dire* examination largely is within the discretion of the circuit judge There, this Court found no abuse of judicial discretion in the circuit judge's refusal to permit a plaintiff's attorney to mention a specific sum sought as damages during *voir dire*

examination, that attorney having failed in the trial
court even to attempt to rephrase his question to
the jurors and, obviously, having failed to persuade
this Court that the circuit judge's ruling prejudiced
plaintiff's case. Thus, in this case of Bunda, had
a properly specific objection been made to the ques-
tions asked by plaintiff's counsel during the *voir
dire,* the circuit judge, on the authority of *Spelker*
v. *Knobloch,* would not have abused his judicial dis-
cretion had he sustained such an objection. How-
ever, *Spelker* does not consider the converse situa-
tion presented by this appeal, whether a circuit
judge's *refusal* to sustain such an objection consti-
tutes an abuse of judicial discretion. Since we should
reverse and remand for new trial, for errors to be
discussed, *infra,* and since this issue may arise again
in the event of a retrial, I consider it appropriate
to examine the issue on its merits.[3]

. I would not consider it an abuse of judicial dis-
cretion for a circuit judge to permit questions to be
asked on *voir dire* such as were asked in this case
since, as will be demonstrated, *infra,* there are pro-
spective jurors who would refuse to award what they
regard as large verdicts, regardless of evidence
which might justify such verdicts. A litigant's right
to trial before an impartial jury (Const 1963, art 1,
§ 14) requires that he be given an opportunity to
obtain the information necessary to challenge such
individuals for cause or peremptorily. Of interest
is the case of *Murphy* v. *Lindahl* (1960), 24 Ill App
2d 461 (165 NE2d 340, 82 ALR2d 1410), which dis-
cusses the problem thusly (pp 470, 471):

"Complaint is made of error during the *voir dire.*

---

[3] From what follows it should be apparent that I do not agree
with the holding of the Court in *Spelker* v. *Knobloch.* However, it
is not necessary for purposes of this decision to consider overruling
*Spelker.* It will be time enough to consider that when we are again
faced with the necessity of reviewing a circuit judge's refusal to
permit mention during *voir dire* of a specific sum sought as damages.

Plaintiff's attorney sought to elicit answers showing the attitude of the prospective jurors toward returning a $300,000 verdict, the amount sued for. One woman answered that under no circumstances would she affix her name to such a verdict. One man answered, 'I would not sign a verdict. I don't think the injury would be worth $300,000.' Questions were asked of the female prospective jurors as to how they might react to evidence showing the crushed and bleeding leg of plaintiff. One woman was excused for cause, because she said such evidence would make her sick.

"Plaintiff was entitled to a *voir dire* examination sufficient to show that each juror accepted was free from bias, prejudice or an opinion implying a prejudgment of the case, which would not readily yield to contrary evidence, so that he could fairly and impartially try the case according to law and the evidence, and render a true verdict. Questions which are designed to obtain a pledge from the prospective juror as to how he would decide the case on an assumed state of facts, or to obtain a statement showing which party he would favor in a supposed state of the evidence, are improper. *People* v. *Robinson,* 299 Ill 617, 619 (132 NE 803); *People* v. *Wiggins,* 231 Ill App 467, 477.

"The instant record shows that some prospective jurors may have had fixed opinions, which indicate bias or prejudice against large verdicts, and which might not readily yield to proper evidence. Questions which tend to be gruesome and inflammatory should be avoided, but again the instant case demonstrates that it is possible for a prospective juror to be so sensitive to some evidence as to make effective and impartial jury duty improbable. We see no abuse of discretion in the instant case."

Veniremen holding views such as those expressed in *Murphy* are subject to challenge for cause under GCR 1963, 511.4, which lists as grounds:

"(4) that the person shows a state of mind which

will prevent him from rendering a just verdict, or has formed a positive opinion on the facts of the case or as to what the outcome should be;

"(5) that the person has opinions or conscientious scruples which would improperly influence his verdict."

If a plaintiff were not permitted to ask questions like those asked in *Murphy,* he would be deprived unfairly of his right to challenge such persons for cause.

In the annotation, Propriety of inquiry on *voir dire* as to juror's attitude toward amount of damages asked, 82 ALR2d 1420 (1962), it is said, with support of cited cases:

"The cases here discussed have generally recognized the rule that the trial judge ordinarily has a wide measure of discretion in controlling the scope of inquiry on *voir dire* and that the allowance or denial of a particular inquiry constitutes reversible error only where that discretion was clearly abused and prejudice resulted. In most of the cases the view has been taken that possible prejudice against large verdicts is a matter as to which the trial court can properly permit inquiry, so long as the question is not so phrased as to amount to an attempt to pledge the juror to a particular award. It has been so held in several actions for personal injury."

Further evidence that some prospective jurors have acquired prejudices against large verdicts is found in *Moore* v. *Ready Mixed Concrete Co.* (Mo, 1959), 329 SW2d 14, 21:

"A more serious question arises in connection with contentions of error in regard to questions propounded to the jury panel by plaintiff's counsel upon the *voir dire* examination. That complaint is based upon the following: 'Mr. Hardy: Now, in this case I state that the amount sued for is $300,000. Naturally, this jury will be the final judge of the amount,

if any, of the damages to which Mr. Moore is entitled, but in filing this case the figure of $300,000 was not just picked out of the air.   We intend to prove damages amounting to more than that.   *   *   * Is there any one on the panel that if the plaintiff's evidence shows you that Bob Moore has been ruined for life, and that he has been damaged at least $300,-000, and under the court's instructions as to the law you feel he is entitled to recover, is there anyone who would have any hesitancy for any reason in bringing in a verdict of $300,000 for him, if the evidence shows he is entitled to it?   Mr. Howard L. McIntosh: I am afraid I would.'   Without any specific challenge being made the court excused Mr. McIntosh.   Mrs. Robinson (of the jury panel) then asked that the question be repeated.   At that point counsel for defendants (out of the hearing of the jury) moved that the panel be discharged upon the ground that the question imposed upon the panel a commitment of a willingness to return a verdict for $300,000.   The motion was overruled.

"Thereafter, the following occurred: 'Mr. Hardy: My last question was that in view of the fact that the plaintiff is here seeking damages in the amount of $300,000, if we prove damages to Mr. Moore of $300,000 or more, and if under the court's instructions concerning the law it is shown that we are entitled to recover, would you have any hesitancy in bringing back a verdict that large?   Mrs. Robinson: I believe so; being a business woman; yes.' "

Although the Missouri court said that it was unnecessary to consider the question directly, it stated that any possible prejudice which might have resulted to defendant was corrected by the trial judge's instruction to the jury that they had not been committed by the *voir dire* examination to return a verdict for any particular amount.

Some courts, however, have expressed concern that the mention upon *voir dire* of a monetary amount would permit "adroit and resourceful" coun-

sel in final argument to convince the jury that they had already committed themselves to return a verdict in the mentioned amount. See *Henthorn* v. *Long* (1961), 146 W Va 636, 652, 653 (122 SE2d 186). Such an argument begs the question, in that it assumes that counsel will be permitted to question jurors in such a. manner as to exact an express or implied pledge on their part. Of course, counsel can, and should, be barred from doing so. It would not, however, be an abuse of judicial discretion to permit counsel to question jurors to determine whether they would be willing to return a verdict for plaintiff in the amount requested if they find upon all evidence adduced at trial that he is entitled to such amount. A plaintiff who is not permitted to ask such questions may end up with jurors like Mrs. Robinson in *Moore, supra,* who would hesitate in returning a verdict to which plaintiff was legally entitled. A fair trial is predicated upon an impartial jury, and to deny plaintiff the right to make inquiries of this nature might subject him to a jury prejudiced against awarding him what lawfully may be due him. If such interrogation by plaintiff's counsel be allowed, defendant, of course, would be entitled to have the jury instructed, at the time of the *voir dire* as well as in the formal charge to the jury, that such *voir dire* inquiries are in no way binding upon them, as was done in *Moore*.

## C.

Defendant next argues that knowledge that he carried automobile liability insurance was conveyed improperly to the jury when the following colloquy occurred between plaintiff's counsel and a witness, Mr. Rycerz, upon redirect examination:

"*Q*. Mike, prior to this suit and back in about. December of last year were you asked for and did

you give a statement to a man who came out to your house representing Mr. Hardwick; do you recall that?

"*A.* He said he was a representative from the Triple A.

"*Mr. Bush:* Just a moment, Your Honor, this is all irrelevant and immaterial. This man is Mr. Walsh's witness. I presume he does not intend to impeach him.

"*Mr. Walsh:* I intend to employ a statement to refresh the witness' recollection. I do not care about any—

"*Mr. Bush:* May I address the court, Your Honor?

"*The Court:* You may proceed.

"*Mr. Bush:* I should like to address the court, if I may, Your Honor. As I understand it, this is a witness on direct examination by Mr. Walsh and there is no question of any impeachment proceedings.

"*The Court:* No.

"*Mr. Bush:* I think under those circumstances it would be improper to use the tactics that he is using.

"*The Court:* I do not believe he is going to impeach him.

"*Mr. Bush:* That would be the only purpose for using a prior writing, Your Honor, and basis that I know of in the law.

"*Mr. Walsh:* I would suggest and submit to the court that I can use it to refresh recollection if it has this effect and I would propose to do so.

"*Mr. Bush:* If we are going to get into a legal discussion, Your Honor, I would suggest that we take a short recess before there is any ruling on a matter of this importance.

"*The Court:* You may proceed."

We have examined the testimonial context in which this exchange took place and are convinced that the circuit judge was warranted in refusing to grant defendant's motion for mistrial, made one week later. The following language from *Trafamczak* v. *Anys* (1948), 320 Mich 653, 662, is relevant:

"In the case at bar it does not appear that any attempt was made by counsel for the plaintiff to make any use whatsoever of the statement concerning insurance. Neither does it appear that the matter was designedly injected into the case. The form of counsel's question was not such as to call for any statement from the witness as to what defendant had said with reference to insurance."

## D.

One more alleged error in the trial proceedings remains to be considered. During the trial one of plaintiff's counsel informed the circuit judge that Mrs. Bunda had told him that she heard someone in the jury room, near the open door of which she was sitting, say that defendant Brown had not appeared for trial because he had no insurance. A hearing on the matter was held in the judge's chambers and the following discussion occurred:

"*Mr. Walsh:* * * * I gather that the court officer was present with the jury in the jury room.

"*Eugene Stewart* [court officer]: Yes, I was there, Bill.

"*The Court:* Did you hear any discussion in that regard?

"*Eugene Stewart:* I did not get in any discussion about it. One of the other ones answered. He heard that he did not have insurance.

"*The Court:* One of the men jurors?

"*Eugene Stewart:* One of the other men there.

"*Mr. Walsh:* It was not your voice that answered the question, Gene?

"*Eugene Stewart:* I said I don't know what it is; he might be in jail, I don't know; I don't know anything about it, Bill.

"*Mr. Walsh:* As I say, to the extent I asked my lady she admits she did not see Gene, she was not watching Gene, he was around and all she was doing —it was a voice thing, but I thought I should bring it

to the court's attention, perhaps, to have the court bring it to Gene's and see if this occurred.

"*Eugene Stewart:* I never get into any of those discussions, Bill. The only thing I answer if they ask me anything about hours or anything, then I will answer it, but otherwise about the case that is to be saved until after.

"*Mr. Bush:* Did the conversation take place inside the jury room, Gene?

"*Eugene Stewart:* Inside the jury room right here about a quarter after 1. I said he could be in jail for all I knew, I didn't know, but I don't know anything about the case, only what I am hearing here.

"*Mr. Bush:* But you did not directly make any reference to the presence or absence of insurance on the part of the defendant Brown?

"*Eugene Stewart:* No, I don't know.

"*Mr. Walsh:* As I say, I am delighted to hear that myself. It certainly worried me.

"*Eugene Stewart:* Somebody asked the other day about insurance and I told them that it could not be said in the courtroom in certain cases that I knew of. * * *

"*The Court:* There was no one in the jury room outside of the jurors at this time?

"*Eugene Stewart:* No. The only one in there was Judge Kane.

"*The Court:* Well, I am sure he would not raise the insurance question.

"*Mr. Walsh:* Did you say Judge Kane was there at the time?

"*Eugene Stewart:* He was playing euchre. * * *

"*Mr. Walsh:* I have noticed in this case, Your Honor, that you have not been admonishing the jury at the day's end and as they hit breaks that they are not to consider the case until it ends and that they are not to talk with themselves either.

"*The Court:* I usually do that toward the end of it, but I will do that tonight."

On the basis of this hearing defendant moved for a

mistrial and renewed his motion at the end of plaintiff's proofs. The motion should have been granted.

The conduct of the court officer as disclosed by this record should not have been tolerated. It is clear that he conversed with jurors in the jury room during the trial and that he listened to them discussing the case prior to deliberation, which is in itself improper, and against which a jury should be instructed at the very beginning of a trial and periodically thereafter. It is clear, also, that in the course of one such conversation the court officer answered a question concerning insurance by saying that in certain cases insurance could not be mentioned. Whether the jury inferred from this answer that appellant was or was not insured is irrelevant, since whichever inference they drew would mean that the issue of appellant's being insured had been injected into the case in violation of CLS 1961, § 500.3030 (Stat Ann 1957 Rev § 24.13030), now a rule of this Court by virtue of GCR 1963, 16. See *Darr* v. *Buckley* (1959), 355 Mich 392.

Had these conversations occurred after the jury had retired for deliberation, it could not be questioned that a new trial would have been in order. *People* v. *Kangas* (1962), 366 Mich 201, 206. Plaintiff argues, however, that because these conversations occurred during trial, but before the jury had retired to deliberate upon its verdict, they were not improper. The argument is unsound.

A jury is summoned to decide a case solely upon the basis of testimony and other evidence presented in open court. To permit a court officer to associate unnecessarily with the jurors, and to answer questions upon points of procedure, and who knows what else, deprives litigants of the right to a decision grounded solely upon evidence produced in open court. See, generally, *Turner* v. *Louisiana* (1965), 379 US 466 (85 S Ct 546, 13 L ed 2d 424). The court

officer who is put in charge of a jury to prevent, as far as is practicable, outside sources from influencing its verdict, should not be permitted to be the source of such influence.

A court officer should not converse with the jurors at any time, except as necessary to direct them where to go and when. If they ask him any questions in any way related to the case on trial, he should tell them that he is not permitted to make any comment upon the case or its conduct, but that he will take to the judge any written questions they may have. Except in unusual circumstances, see, for example, *Hampton* v. *Van Nest's Estate* (1917), 196 Mich 404, 409, there is no need for the court officer even to be in the jury room when the jurors are there. The judge should inform the jury even prior to trial that this must be the type of relationship it has with the court officer.

The reversal of this case probably would not have been necessary had the circuit judge instructed the jurors not to discuss the case among themselves until they retired for deliberation, or had he instructed his court officer to refrain from untoward fraternization with the jurors. This latter point we emphasize, since apparently our admonition in *People* v. *Kangas, supra,* is not yet being heeded by all circuit judges. We there were careful, at p 208, to "caution trial judges that bailiffs, sheriffs, and other court personnel should be warned about practices involving associations with jurors both in and out of the courtroom which might create the opportunity to influence their decisions."

## II.

Since this case should be retried, it is not inappropriate to discuss some of the alleged instructional errors which may arise again upon retrial.

A.

Defendant Hardwick requested an instruction that if the Hardwick-Bunda collision were caused by Mr. Hardwick's negligence, plaintiff could not sue under the wrongful death act unless the injuries inflicted to Mr. Bunda in that accident were fatal. Defendant argues that if his negligence were found to have caused the Hardwick-Bunda collision, then Mr. Bunda's widow could not recover against him under the wrongful death act, but rather her remedy against him would be under the survival act, CL 1948, § 612-.32 (Stat Ann § 27.684).[4] The assumption implicit in this argument is that Mr. Hardwick's asserted negligence was not a proximate cause of Mr. Bunda's death, and that, since Mr. Hardwick did not cause that death, he may not be sued under the wrongful death act, plaintiff's remedy being properly under the survival act. We do not agree.

The wrongful death act, at the time, read pertinently:

"Whenever the death of a person or injuries resulting in death, shall be caused by wrongful act, neglect or default, and the act, neglect or default is such as would (if death had not ensued) have entitled the party injured to maintain an action and recover damages, in respect thereof, then and in every such case, the person who, or the corporation which would have been liable, if death had not ensued, shall be liable to an action for damages." CL 1948, § 691.581 (Stat Ann 1959 Cum Supp § 27.711).

The jury was entitled to find that the injuries resulting in Mr. Bunda's death were caused by Mr. Hardwick even if Mr. Bunda would not have died as the result of injuries directly incurred in the

---

[4] See, currently, CLS 1961, § 600.2921 (Stat Ann 1962 Rev § 27A.2921).

Hardwick-Bunda collision.   Section 443 of Restatement, Torts 2d (1965) states the correct rule:

"The intervention of a force which is a normal consequence of a situation created by the actor's negligent conduct is not a superseding cause of harm which such conduct has been a substantial factor in bringing about."

Illustration 3 of section 443 covers the situation hypothesized by Hardwick:

"3. A car negligently driven by A strikes B and leaves him unconscious on the highway.   Shortly afterward B is run over and further injured by a car negligently driven by C.   A is subject to liability to B for both injuries."

And see *Comstock* v. *General Motors Corporation* (1959), 358 Mich 163 (78 ALR2d 449); Prosser, The Law of Torts (3d ed 1964), p 315.

## B.

Defendant relies also on *Maddux* v. *Donaldson* (1961), 362 Mich 425 (100 ALR2d 1) to relieve himself of liability for Mr. Bunda's death.   His reliance upon *Maddux* is misplaced.   He cites this language in particular (p 432):

"It is our conclusion that if there is competent testimony, adduced either by plaintiff or defendant, that the injuries are factually and medically separable, and that the liability for all such injuries and damages, or parts thereof, may be allocated with reasonable certainty to the impacts in turn, the jury will be instructed accordingly and mere difficulty in so doing will not relieve the triers of the facts of this responsibility."

The language quoted states the law correctly, but it does not serve to relieve defendant Hardwick of liability for Mr. Bunda's death if Mr. Hardwick's

actions were a proximate cause of that death.   This
is shown by language in *Maddux* which appears after
that just cited, quoting the 4 Restatement, Torts
(1939), § 879, and an illustration thereof:

"Concurring or Consecutive Independent Acts.

"Except as stated in section 881 [referring to the
apportionment of damages in a nuisance case], each
of two persons who is independently guilty of tor-
tious conduct which is a substantial factor in caus-
ing a harm to another is liable for the entire harm,
in the absence of a superseding cause.   *   *   *

"2. A negligently knocks B into the street, the
impact causing B no substantial harm.   Before B
can arise, however, he is negligently run over by C
who is acting in the scope of his employment as D's
servant.   B is severely hurt thereby.   For this harm
B is entitled to a judgment for the entire amount of
harm from A, C or D or all of them."   See 362 Mich
425, 433, 434.

Mr. Hardwick's situation is analogous to A's in the
illustration, and thus even under *Maddux* he prop-
erly may be held liable for Mr. Bunda's death.

### C.

Defendant alleges that the instruction given con-
cerning his duty to drive so as to be able to stop
within the assured clear distance ahead[5] was errone-
ous.   We have read the charge dealing with this
matter and are convinced that read in its entirety it
was not reversibly erroneous.

### D.

Defendant objects because the circuit judge in-
structed the jury that there was a presumption,
which could be overcome by credible evidence, that

---

[5] See CLS 1961, § 257.627 (Stat Ann 1960 Rev § 9.2327).—Re-
porter.

Mr. Bunda was in the exercise of due care when struck by Mr. Hardwick's vehicle. The evidence in this case tending to establish Mr. Bunda's alleged contributory negligence was not so free from doubt or uncertainty as to have precluded a finding by the jury that he was free from contributory negligence at the time he was struck by Mr. Hardwick. Thus, the circuit judge did not err in informing the jury of the presumption. See *Hill* v. *Harbor Steel & Supply Corporation* (1965), 374 Mich 194, 208–210.

No other alleged instructional error merits discussion.

## III.

The questions raised by defendant on this appeal were not waived, as claimed by plaintiff, because he failed to move for a new trial and instead appealed directly. All of the alleged errors considered were ruled upon by the circuit judge during the proceedings below. To preserve such points for appellate review it is not necessary for counsel again to ask the circuit judge to reverse himself, by ruling differently upon questions he already has ruled upon. See *Kiernan* v. *Van Schaik* (CA 3, 1965), 347 F2d 775, 777:

"The error was not waived because it was not assigned in the motion for new trial. Objections to rulings made at trial are ripe for review and need not be reiterated in the court below on a motion for new trial. This is equally true whether no such motion is made or the objection is not included as a ground for new trial when a motion is filed. See 6 Moore, Federal Practice (2d ed 1953), § 59.14."

This case should be reversed and remanded. Costs may be assessed.

T. M. KAVANAGH, C. J., and DETHMERS, J., concurred with SOURIS, J.

O'HARA, J. (*for affirmance*). I agree with and concur in all of Mr. Justice SOURIS' opinion except that which he designates "I-D" and which is concerned with the incident in the jury room involving a court officer during a recess. My able Associate properly enunciates the rule that a court officer should not converse with jurors at any time, except in the fulfillment of his duties. As I read the record, this is precisely what the bailiff did. Mr. Justice SOURIS has quoted the questioning of the officer and I need not requote it. The straightforward answers of the officer to the court and counsel may not reflect the precision of phrase nor the nicety of distinction of an academician but they do portray to me an eminently honest officer who conveyed no information that could possibly have influenced the jury. I also read the record as establishing that the late Circuit Judge Edward Kane, the other circuit judge of that circuit, was present in the room when the incident took place. It is inconceivable to me that had any impropriety occurred that he would not have immediately reported it to the trial judge.

I find no reversible error in the colloquy. Certainly, I can find in it no suggestion that defendant Hardwick was or was not insured.* In simple substance, I do not believe that jurors are so easily influenced as to permit the quoted exchange between some of them and the bailiff to affect their verdict. Since this is the sole ground upon which Mr. Justice SOURIS reverses and remands, I reach the opposite conclusion. I would affirm the judgment, with costs to plaintiff.

KELLY, J., concurred with O'HARA, J.

ADAMS, J. (*for affirmance*). I agree and concur in

---

* See CLS 1961, § 500.3030 (Stat Ann 1957 Rev § 24.13030).— REPORTER.

all of Mr. Justice SOURIS' opinion, including his strictures in section "I-D" thereof with regard to the proper conduct of a court officer. However, I agree with Mr. Justice O'HARA, for the reasons stated in his opinion, that in this case there was no impropriety.

I vote to affirm the judgment, with costs to plaintiff.

SMITH, J., concurred with ADAMS, J.

BLACK, J., did not sit.