305 S.E.2d 316

**Richard Harold THORNTON, Jr.**

v.

**CAMC, ETC., and Jack Pushkin, M.D.**

**No. 15329.**

Supreme Court of Appeals of West Virginia.

July 8, 1983.

Guy R. Bucci, Charleston, for appellant.

Wilson Anderson, Steptoe & Johnson, Charleston, for appellee.

MILLER, Justice:

This is the second appeal filed by Richard Thornton, Jr., the plaintiff, in this medical malpractice action against Jack Pushkin, M.D., the defendant. In the original appeal we considered the validity of the plaintiff's release and remanded the case for further fact-finding. *Thornton v. Charleston Area Medical Center*, 158 W.Va. 504, 213 S.E.2d 102 (1975).

On remand to the Circuit Court of Kanawha County, a bifurcated trial was held. The first proceeding was to determine whether the plaintiff intended to release Dr. Pushkin and the Charleston Area Medical Center when he released the original tort-feasors. The jury found for the plaintiff on this issue. Subsequently, the Charleston Area Medical Center settled with the plaintiff out of court. The second proceeding involved determining the liability of the defendant doctor on the malpractice issue.

The jury found in Dr. Pushkin's favor on the issue of liability. After the court denied plaintiff's motion to set aside the verdict and award a new trial, this appeal was filed. The plaintiff makes several assignments of error: the limitation of *voir dire*,

the use of medical treatises, the denial of an instruction relative to the "value of a chance," and the locality rule for expert medical testimony. Finding no error, we affirm.

The record indicates that the plaintiff sustained a compound comminuted fracture of his right leg in a motorcycle accident which occurred on June 24, 1969. He was hospitalized at the Charleston General Hospital (now Charleston Area Medical Center) under Dr. Pushkin's care for approximately two months. For the next four years he underwent further medical treatment and additional hospitalizations for treatment of his leg. Mr. Thornton continued to have problems and finally, on May 14, 1973, his right leg was amputated below the knee by Dr. Harold Kuhn.

## I.

■ The plaintiff's first contention is that the court erred in unduly restricting the scope of *voir dire* and in denying his counsel the right personally to conduct the *voir dire* examination of potential jurors. The scope of *voir dire* is generally a matter within the discretion of the trial court but is subject to review for abuse of discretion. *State v. Peacher,* 167 W.Va. 540, 280 S.E.2d 559 (1981); *Thornsbury v. Thornsbury,* 147 W.Va. 771, 131 S.E.2d 713 (1963). A fair and impartial trial, however, requires a fair and impartial jury, and, as we said in *W. Va. Human Rights Commission v. Tenpin Lounge, Inc.,* 158 W.Va. 349, 211 S.E.2d 349, 353 (1975):

> "*Voir dire* examination is designed to allow litigants to be informed of all relevant and material matters that might bear on possible disqualification of a juror and is essential to a fair and intelligent exercise of the right to challenge either for cause or peremptorily. Such

examination must be meaningful so that the parties may be enabled to select a jury competent to judge and determine the facts in issue without bias, prejudice or partiality."

*See also State v. Payne,* 167 W.Va. 252, 280 S.E.2d 72 (1981); *State v. Pendry,* 159 W.Va. 738, 227 S.E.2d 210 (1976); *Henthorn v. Long,* 146 W.Va. 636, 122 S.E.2d 186 (1961). We have held that where a trial court's restriction of the scope of *voir dire* "undermines the rights sought to be protected by the *voir dire* process," *State v. Peacher, supra,* 167 W.Va. at ——, 280 S.E.2d at 570, then an abuse of discretion occurs.

■ We have reviewed the *voir dire* examination itself and the plaintiff's motion for supplemental *voir dire* along with the court's reasons for refusing to ask some of the questions included in that motion. We conclude that the *voir dire* was fair and adequate and that plaintiff's rejected questions did not relate to substantial issues that were relevant to determining whether the jury was biased. Consequently, we find that the trial court did not abuse its discretion.

The plaintiff contends that under W.Va. Code, 56–6–12,[1] his counsel had the right personally to conduct the *voir dire* examination. However, the language of this statute does not grant such a right; rather, it is couched in terms of the permissive "[e]ither party … may … examine … any person … called as a juror." We find no previous cases in which we have held that an attorney has an absolute right to conduct a *voir dire.* The scope of *voir dire* is within the trial court's discretion under Rule 47(a) of the West Virginia Rules of Civil Procedure:

> "Rule 47. Jurors. (a) *Examination of jurors.*—The court may permit the parties or their attorneys to conduct the examination of prospective jurors or may

1. W.Va.Code, 56–6–12, provides as follows:

"Either party in any action or suit may, and the court shall on motion of such party, examine on oath any person who is called as a juror therein, to know whether he is a qualified juror, or is related to either party, or has any interest in the cause, or is sensible of any bias or prejudice therein; and the party objecting to the juror may introduce any other competent evidence in support of the objection; and if it shall appear to the court that such person is not a qualified juror or does not stand indifferent in the cause, another shall be called and placed in his stead for the trial of the cause. And in every case, unless it be otherwise specially provided by law, the plaintiff and defendant may each challenge four jurors peremptorily."

itself conduct the examination. In the latter event, the court shall permit the parties or their attorneys to supplement the examination by such further inquiry as it deems proper or shall itself submit to the prospective jurors such additional questions of the parties or their attorneys as it deems proper."

Under this rule, the fact that the court itself conducted the *voir dire* examination is not error. *See State v. Pendry, supra.*

## II.

### A.

■ The second issue raised by the plaintiff contains two parts. The first is that the circuit court erred in denying his request to allow his expert medical witness to rely on medical treatises in his direct examination. The second relates to restricting the use of medical treatises in the cross-examination of the defendant's expert medical witnesses. Plaintiff urges us to adopt Rule 803(18) of the Federal Rules of Evidence, which provides:

"The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

\*     \*     \*     \*     \*     \*

"(18) Learned treatises. To the extent called to the attention of an expert witness upon cross-examination or relied upon by him in direct examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art,

established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice. If admitted, the statements may be read into evidence but may not be received as exhibits."

A review of the designated record in this appeal does not specifically reveal how the plaintiff intended to use medical treatises in the direct examination of Dr. Byron Genner, who apparently was his only expert medical witness. The record is incomplete in this area, apparently because the plaintiff's attorney utilized the provisions of Rule 4A of our Rules of Appellate Procedure, which permits an appeal without the necessity of an evidentiary transcript.[2] Once a Rule 4A petition is accepted, it is clear under Rule 7(c)[3] of our Rules of Appellate Procedure that the parties must still furnish a record which actually encompasses all of the facts and testimony relevant to the issues raised in the petition. We have commented on the need to have an adequate record for appeal, especially when the appellant is proceeding under Rule 4A, in *Bowman v. Barnes*, 168 W.Va. 111, 282 S.E.2d 613, 622 n. 15 (1981):

"In his initial petition for appeal, the plaintiff utilized the procedure set forth in Rule 4A of the Rules of Appellate Procedure ... which permits statement of facts in the petition to serve in place of the transcript of testimony. Rule 4A requires the petition to be served on the other parties who can then file a reply petition. However, once an appeal is

---

2.  Rule 4A, in material part, provides:

"(a) *Purpose.* In order to provide an inexpensive and expeditious method of appeal, a petitioner may file his petition without the transcript of testimony taken in the lower court.

"(b) *Filing with Circuit Court.* Eight copies of the petition shall be filed in the office of the clerk of the circuit where the judgment or order being appealed was entered within sixty days from the date of entry of the judgment or order. Two additional copies of the petition shall be served upon each party to the action being appealed, as provided in Rule 15, and such parties shall have thirty days to file a reply petition with the clerk of the circuit court. The respondent shall not be entitled to an oral argument under Rule 5."

3.  The material portion of Rule 7(c) states:

"*Allowance.* If the petition for appeal is granted:

"(1) The Clerk of the Supreme Court shall docket the same and immediately send a copy of the order granting the appeal to the petitioner's counsel, or, if there is no counsel of record, to the petitioner, and to the clerk of the circuit court, who shall retain the same in his records.

"(2) The Clerk of the Supreme Court shall forthwith return the record to the clerk of the circuit court for preparation of the record of the case for appeal in accordance with Rules 8 and 9."

granted, Rule 8 of the Rules of Appellate Procedure ... requires the development of an adequate appeal record by both parties. This also accords with the requirement of W.Va.Code, 58–5–6. In the present case, we do not have a transcript of the testimony taken at trial. All parties to the appeal have proceeded to present the key facts surrounding the accident by narrative statements in their briefs. Where their respective statements do not appear to be in dispute, we have addressed the points of error raised. *In so doing, counsel should not assume that we will in the future sanction this practice.*" (Emphasis added; Citations omitted).

*See also State v. Cox,* 171 W.Va. 50, 297 S.E.2d 825, 828 (1982).

This Court "is limited in its authority to resolve assignments of nonjurisdictional errors to a consideration of those matters passed upon by the court below and fairly arising upon the portions of the record designated for appellate review." Syllabus Point 6, in part, *Parker v. Knowlton Construction Company, Inc.,* 158 W.Va. 314, 210 S.E.2d 918 (1975). Accordingly, we do not reach the merits of whether the circuit court erred in refusing to allow Dr. Genner to rely on medical treatises because the issue has not been sufficiently presented to us in the designated record.

### B.

The record is clearer with respect to the plaintiff's use of medical treatises in the cross-examination of Drs. Morris O'Dell, John Schaefer and Carl Roncaglione, all of whom testified on behalf of the defendant doctor.[4] A partial transcript was provided which contains only the part of the cross-examination of these three doctors where plaintiff's attorney attempted to have each expert recognize Campbell's Operative Orthopaedics (5th ed. 1971), and Watson-Jones, Fractures and Joint Injuries (5th ed. 1976), as authoritative medical textbooks. If the expert recognized the textbook as

authoritative, then plaintiff's attorney would quote portions of the book and ask the expert whether he agreed with the quoted text passage.

Plaintiff's attorney asked Dr. O'Dell if he had studied Fractures and Joint Injuries when he was a medical student and asked if he was familiar with Campbell's Operative Orthopaedics. Dr. O'Dell stated that he did not question the texts that are used in medical schools, but that he had built up his experience through actual practice and was not familiar with the contents of the cited texts. He further explained that he was not an orthopedic surgeon and could not answer whether Campbell's Operative Orthopaedics was a standard teaching text. The excerpt from Dr. O'Dell's cross-examination ends without revealing any attempt by plaintiff's attorney either to quote portions of the texts or to prove the authoritativeness of the texts through other means.

Dr. Schaefer admitted during cross-examination that Fractures and Joint Injuries was a standard medical text and that it was a recognized authority on the subject of orthopedic injuries. He was then quoted part of the text, to which Dr. Schaefer replied that he agreed with the statement. After listening to another quote from the textbook, Dr. Schaefer stated that he agreed in part with the textbook and explained his answer.

Dr. Roncaglione stated that Campbell's Operative Orthopaedics was from time to time a recognized authoritative source of orthopedic literature. After listening to several quotes from the textbook, Dr. Roncaglione distinguished the textbook medical information quoted from the facts relevant to plaintiff's condition.

We have not discovered any West Virginia decisions which clearly address the issue of how medical treatises may be used in the cross-examination of expert witnesses. The Virginia Supreme Court has permitted cross-examination of a medical witness by use of a medical treatise in *Hop-*

---

**4.** The cross-examination of Dr. H. H. Hills, who also testified for Dr. Pushkin, was not included in the partial transcript.

kins v. Gromovsky, 198 Va. 389, 395, 94 S.E.2d 190, 194 (1956), stating:

"[I]t was proper for counsel for the plaintiff to test the knowledge and accuracy of Dr. Tucker, a witness for the defendant, on cross-examination by reading to him pertinent extracts from the article and asking him whether he agreed or disagreed with what had been read."

The Virginia court relied heavily on this quotation from Lawrence v. Nutter, 203 F.2d 540, 542–43 (4th Cir.1953):

"[A] substantial body of authority ... holds that when a witness is testifying as an expert, it is competent to test his knowledge on cross-examination by reading to him extracts from scientific authorities, which he recognizes as standard upon the subject matter involved, and then ask him whether he agrees or disagrees with what has been read.... This view has met the approval of the more recent authorities."

There is little question that most courts have sanctioned the use of authoritative learned treatises in the cross-examination of expert witnesses to some degree. See 3 C. Kramer, Medical Malpractice ¶ 29.06[3] (1982); McCormick on Evidence § 321 (1972); 6 J. Wigmore, Evidence § 1700 (Chadbourn rev. 1976); 32 C.J.S. Evidence § 574(1) (1964); Comment, Evidence—Use of Learned Treatises in Cross-Examination of Expert Witnesses, 68 W.Va.L.Rev. 329 (1966); Annot., 60 A.L.R.2d 77 (1958). Courts differ, however, with regard to the foundation that must first be established before learned treatises can be utilized on cross-examination of an expert witness, as summarized in 31 Am.Jur.2d Expert and Opinion Evidence § 67 at 576–77 (1967):

"(1) [S]ome courts have held that where the expert has relied generally or specifically upon the authorities, he may be attacked upon the basis of authorities which are not necessarily the same as those which he has himself used; (2) another group of cases takes the view that the expert may be examined upon the basis of treatises which he has himself recognized as having authoritative status, whether or not he relied thereon

in forming his opinion; and (3) there are many cases recognizing that the cross-examiner may use treatises the authority of which is established in any acceptable manner, to test the qualifications of the witness, regardless of whether that witness has relied upon or recognized the treatise." (Footnotes omitted)

See also Annot., 60 A.L.R.2d 77, 79 (1958).

■ From the limited record before us, it appears that the circuit court rejected the limited rule that a medical expert can only be cross-examined on medical treatises or articles that he relied upon for the basis of his direct examination. The circuit court held that where a treatise was recognized by a medical expert witness as authoritative, then he could be asked about its statements for purposes of impeachment during cross-examination. This rule is supported by a number of cases and we adopt it. E.g., United States v. Erdos, 474 F.2d 157 (4th Cir.1973), cert. denied, 414 U.S. 876, 94 S.Ct. 42, 38 L.Ed.2d 122; Purcell v. Zimbelman, 18 Ariz.App. 75, 500 P.2d 335 (1972); Shepherd v. State, 270 Ark. 457, 605 S.W.2d 414 (1980); Fleming v. Prince George's County, 277 Md. 655, 358 A.2d 892 (1976); Jones v. Bloom, 388 Mich. 98, 200 N.W.2d 196 (1972); Dinner v. Thorp, 54 Wash.2d 90, 338 P.2d 137 (1959). As to Drs. Schaefer and Roncaglione, both acknowledged the authoritative nature of the treatises and plaintiff's attorney was permitted to cross-examine them. We find no error in the trial court's ruling.

■ We also agree with those courts that hold that if a medical expert witness refuses to recognize a medical treatise as authoritative, the cross-examining party may prove the authoritativeness of the medical treatise, either through judicial notice or through the testimony of another medical expert witness. Once the trial court has concluded that the authoritativeness of the medical treatise has been established, then the expert may be cross-examined on it. Darling v. Charleston Community Memorial Hospital, 33 Ill.2d 326, 211 N.E.2d 253 (1965); People v. Behnke, 41 Ill.App.3d 276, 353 N.E.2d 684 (1976); Jones v. Bloom, supra; Ravenis v. Detroit

*General Hospital,* 63 Mich.App. 79, 234 N.W.2d 411 (1975); *Kansas City v. Dugan,* 524 S.W.2d 194 (Mo.App.1975); *Foster v. McKeesport Hospital,* 260 Pa.Super. 485, 394 A.2d 1031 (1978); *Dabroe v. Rhodes Company,* 64 Wash.2d 431, 392 P.2d 317 (1964); *Sanderson v. Moline,* 7 Wash.App. 439, 499 P.2d 1281 (1972).[5]

While in the present case, Dr. O'Dell refused to recognize the textbooks as authoritative, there is no indication that plaintiff's attorney made any offer to prove the authoritativeness in some other way. Consequently, we do not find any error committed by the trial court.

### III.

■ The plaintiff assigns as error the court's refusal to give his Instruction No. 11 on what he calls the "value of a chance" theory.[6] We believe the court was correct in refusing to give the instruction as it was worded. The general purpose of such an instruction is to further elaborate the proximate cause theory in medical malpractice. Such an instruction is generally used in situations where the injured plaintiff claims that his original injury was aggravated, causing him to suffer greater harm, as a result of his doctor's failure to render appropriate medical care.

One of the leading decisions concerning the "value of a chance" theory as applied in a medical malpractice case is *Hicks v. United States,* 368 F.2d 626 (4th Cir.1966). In *Hicks,* a physician was found to be negligent as a matter of law for his failure to properly diagnose and treat his patient, who died from an intestinal obstruction, which the physician had diagnosed as gas-

troenteritis. The "value of a chance" theory was applied in *Hicks* because the medical experts who testified at the trial stated that if the patient had been properly diagnosed, she would have recovered from the illness. The court concluded that the physician's negligence "nullified whatever chance of recovery she might have had and was the proximate cause of the death." *Hicks v. United States, supra* at 633.

In a simplified summary within the context of this case, the plaintiff's theory was that his original leg injury had been improperly treated and as a result the injury was aggravated to the extent amputation was necessary. The defendant doctor's theory was that the original injury was so severe that amputation would have resulted regardless of the efficacy of his treatment. The "value of a chance" label comes about because the plaintiff argues that the doctor's negligence eliminated the chance of his right leg healing properly, thus proximately causing the amputation. The issue, however, is still one of causation—did the doctor's actions or inactions increase the risk of amputating the plaintiff's right leg and was this increase in the risk of arm a substantial factor in the amputation of the plaintiff's leg? [7]

Of those jurisdictions that have considered this question, a majority have adopted the principle. *Daniels v. Hadley Memorial Hospital,* 566 F.2d 749 (D.C.Cir. 1977); *McBride v. United States,* 462 F.2d 72 (9th Cir.1972); *Jeanes v. Milner,* 428 F.2d 598 (8th Cir.1970); *Morgan v. District of Columbia,* 449 A.2d 1102 (D.C.1982); *Thomas v. Corso,* 265 Md. 84, 288 A.2d 379 (1972); *Harvey v. Silber,* 300 Mich. 510, 2 N.W.2d 483 (1942); *Kallenberg v. Beth Is-*

---

**5.** The utilization of medical treatises on cross-examination is for the purpose of contradicting the medical expert's statements on direct examination. F. Cleckley, *Handbook on Evidence for West Virginia Lawyers* 308 (1978); McCormick on Evidence § 321 (1972).

**6.** Two articles discussing the "value of a chance" theory are: *Medical Trial Technique Quarterly* 121 (1982), and Note, *Torts—Medical Malpractice,* 45 N.C.L.Rev. 799 (1967).

**7.** Some courts refer to § 323(a) of the Restatement (Second) of Torts:

"Negligent Performance of Undertaking to Render Services

"One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

"(a) his failure to exercise such care increases the risk of such harm."

*See Foskey v. United States,* 490 F.Supp. 1047 (D.R.I.1979); *Hoeke v. Mercy Hospital of Pittsburgh,* 299 Pa.Super. 47, 445 A.2d 140 (1982).

*rael Hospital,* 45 A.D.2d 177, 357 N.Y.S.2d 508 (1974); *Jones v. Montefiore Hospital,* 494 Pa. 410, 431 A.2d 920 (1981); *Whitfield v. Whittaker Memorial Hospital,* 210 Va. 176, 169 S.E.2d 563 (1969).

Pennsylvania has the best developed body of law in regard to this principle and in *Jones v. Montefiore Hospital,* 494 Pa. at 416, 431 A.2d at 923–24, the court explained:

> "Proximate cause is a term of art, and may be established by evidence that a defendant's negligent act or failure to act was a *substantial factor* in bringing about the harm inflicted upon a plaintiff. Pennsylvania law has long recognized that this *substantial factor* need not be, as the trial court incorrectly charged, the only factor, i.e., 'that cause which ... produces the result.' *Gradel v. Inouye,* 491 Pa. 534, 542, 421 A.2d 674, 678 (1980); *Hamil v. Bashline,* 481 Pa. [256] at 266, 392 A.2d [1280] at 1285; *Majors v. Brodhead Hotel,* 416 Pa. 265, 273, 205 A.2d 873, 878 (1965). A plaintiff need not exclude every possible explanation, and 'the fact that some other cause concurs with the negligence of the defendant in producing an injury does not relieve defendant from liability unless he can show that such other cause would have produced the injury independently of his negligence.' *Majors v. Brodhead Hotel,* 416 Pa. at 273, 205 A.2d at 878.
>
> "In *Hamil v. Bashline, supra,* we noted that Section 323(a) of the Restatement (Second) of Torts (1965) has long been recognized as part of the law of Pennsylvania...:
>
>> "[O]nce a plaintiff has demonstrated that defendant's acts or omissions, in a situation to which Section 323(a) applies, have increased the risk of harm to another, such evidence furnishes a basis for the fact-finder *to go further* and find that such increased risk was in turn a *substantial factor in bringing about the resultant harm;* the necessary proximate cause will have

been made out if the jury sees fit to find cause in fact."

(Emphasis in original; Footnotes omitted)

Those courts that have refused to adopt this theory do so based apparently on the premise that it reduces their traditional proximate cause test. *E.g., Hiser v. Randolph,* 126 Ariz. 608, 617 P.2d 774 (1980); *Cooper v. Sisters of Charity of Cincinnati, Inc.,* 27 Ohio St.2d 242, 272 N.E.2d 97 (1971).[8] In *Hiser v. Randolph,* 126 Ariz. at 612–13, 617 P.2d at 778–79, the court stated:

> "In this jurisdiction the tortious act or malpractice must be shown to have been the probable and not merely a possible cause of the death or other untoward result....
>
>     \*    \*    \*    \*    \*    \*
>
> "We agree with the court in *Cooper v. Sisters of Charity of Cincinnati, Inc., supra,* that the mere loss of an unspecified increment of the chance for survival is, of itself, insufficient to meet the standard of probability."

We believe that the value of a chance rule is compatible with our proximate cause test that must be met to connect the defendant's negligence to the plaintiff's injury as set out in Syllabus Point 1 of *Pygman v. Helton,* 148 W.Va. 281, 134 S.E.2d 717 (1964):

> "Medical testimony to be admissible and sufficient to warrant a finding by the jury of the proximate cause of an injury is not required to be based upon a reasonable certainty that the injury resulted from the negligence of the defendant. All that is required to render such testimony admissible and sufficient to carry it to the jury is that it should be of such character as would warrant a reasonable inference by the jury that the injury in question was caused by the negligent act or conduct of the defendant."

*See also Serbin v. Newman,* 157 W.Va. 71, 198 S.E.2d 140 (1973).

---

**8.** As noted in *University Hospital Building, Inc. v. Gooding,* 419 So.2d 1111, 1114 (Fla.App.1982), the intermediate courts of appeal are divided over the issue and the question is on certification to the Florida Supreme Court.

In Syllabus Point 3 of *Hovermale v. Berkeley Springs Moose Lodge*, 165 W.Va. 689, 271 S.E.2d 335 (1980), we said: "Where a physician is testifying as to the causal relation between a given physical condition and the defendant's negligent act, he need only state the matter in terms of a reasonable probability."

■ Thus, we hold that where a plaintiff in a malpractice case has demonstrated that a defendant's acts or omissions have increased the risk of harm to the plaintiff and that such increased risk of harm was a substantial factor in bringing about the ultimate injury to the plaintiff, then the defendant is liable for such ultimate injury.

However, we do not believe that the plaintiff's instruction embodied a correct statement of the law.[9] We recognize that it was patterned after language found in *Whitfield v. Whittaker Memorial Hospital*, 210 Va. at 184, 169 S.E.2d at 568–69, where the court said:

"When a physician's or surgeon's negligent action or inaction has effectively terminated a person's chance of survival, he will not be permitted to raise conjectures as to possible chances for survival that he has put beyond realization. If there was any substantial possibility of survival and the defendant has destroyed it, he is answerable. Rarely is it possible to demonstrate to an absolute certainty what would have happened if certain actions had been taken. The law does not in all circumstances require a plaintiff to show to a certainty that a patient would have lived had he been operated on promptly."

As the court noted in *Slavish v. Ratajczak*, 277 Pa.Super. 272, 277, 419 A.2d 767, 770 (1980), "[s]tatements in opinions are often couched in argumentative language and may be formulated in words expressive of

policy. As such they may mislead a jury. It is better to charge a jury in terms of legal standards and rules."

The problem with the plaintiff's instruction is that it is argumentative and confusing. The portion of the instruction which states "then you are further instructed that the defendant is not permitted to defeat the plaintiff's claim by raising conjecture or speculation as to possible chances of survival," presumes that there is no conflict in the medical testimony about the increased risk of harm arising from the doctor's misdiagnosis and treatment.

We believe this language is inappropriate because it informs the jury that the defendant doctor is not permitted to raise the issue that his alleged failure to properly diagnose and treat the plaintiff's condition had nothing, from a proximate cause standpoint, to do with the subsequent aggravated condition. In this case, the doctor's experts had as a theory that the original injury was such that ultimately amputation would have been necessary regardless of the doctor's subsequent negligence. Yet, the instruction suggests to the jury that the defendant may not raise this issue. Due to this objectionable language, the circuit court was correct in refusing to give this instruction as offered by the plaintiff.

## IV.

■ Finally, plaintiff contends that in several defense instructions given by the court the medical standard of care contained the phrase as being in "accord with reasonable care and diligence as practiced by accredited physicians and surgeons in a locality similar to that in which defendant Pushkin's services were rendered." In *Hundley v. Martinez*, 151 W.Va. 977, 995, 158 S.E.2d 159, 169 (1967), we virtually abandoned the locality rule, *e.g.* "We reject the strict application of the 'locality'

---

**9.** Plaintiff's Instruction No. 11 states:

"The Court instructs the jury that if you find from the evidence in this case that the defendant was negligent in treatment of plaintiff's injury, you are further instructed that if you find that the defendant's negligence either reduced or eliminated the chance of survival of plaintiff's leg and that there was a substantial possibility of survival of the leg, then you are further instructed that the defendant is not

permitted to defeat the plaintiff's claim by raising conjecture or speculation as to possible chances of survival since it is rarely possible for any person to demonstrate with an absolute certainty what would have happened if certain actions had been followed. The law does not in all circumstances require a plaintiff to show to a certainty that his leg would have survived had the defendant not been negligent in his treatment."

rule," and by holding in Syllabus Point 6, in part, that if an out-of-state physician testifies about a "standard [that] is uniform throughout the country; and, that he is familiar with that standard, his testimony is admissible in a malpractice case." [10]

Moreover, in Syllabus Point 4 of *Duling v. Bluefield Sanitarium, Inc.,* 149 W.Va. 567, 142 S.E.2d 754 (1965), we abolished any concept of "locality" when it involved nursing malpractice.[11] However, a full discussion of this issue is foreclosed for several reasons. First, it does not appear that plaintiff's attorney objected to the locality rule language in the defense instructions. Second, plaintiff's Instruction No. 8, which was given, contained "locality" language. Under these circumstances, we do not find error.

For the reasons herein set out, we affirm the judgment of the Circuit Court of Kanawha County.

Affirmed.

---

**10.** For a current summary of cases involving the locality rule, *see* Annot., 99 A.L.R.3d 1133 (1980). Both *Hinkle v. Martin,* 163 W.Va. 482, 256 S.E.2d 768 (1979), and *Brown v. Bluefield Municipal Building Commission,* 167 W.Va. 318, 280 S.E.2d 101 (1981), refer to *Schroeder v. Adkins,* 149 W.Va. 400, 141 S.E.2d 352 (1965), in which the similar locality rule is stated. However, these cases had no occasion to discuss the locality evidentiary rule, and, therefore, should not be considered as altering *Hundley v. Martinez, supra.*

**11.** Syllabus Point 4 of *Duling v. Bluefield Sanitarium, Inc., supra,* states:

"In an action against a private hospital based upon negligence of nurses employed by the hospital in failing properly to attend and care for a patient subject to their care in such hospital, resulting in the death of the patient, it is proper to admit testimony of physicians, or of other qualified persons, concerning the usual standards employed by nurses in caring for patients in hospitals. Such standards need not relate merely to the general area in which the hospital is situated and it is not necessary that such witnesses reside in the general area in which the hospital is situated or that they be acquainted with such standards in that area."