441 S.E.2d 720

**Homer R. HAGER and Nancy Hager, Plaintiff Below, Appellants,**

v.

**N.T. SHANMUGHAM, M.D., Defendant Below, Appellee.**

No. 21663.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 22, 1993.

Decided Nov. 23, 1993.

Arden J. Curry, Arden J. Curry, II, Pauley, Curry, Sturgeon & Vanderford, Charleston, WV, for appellants.

Dino S. Colombo, Richard W. Stuhr, Jacobson, Maynard, Tuschman & Kalur, Morgantown, WV, for appellee.

PER CURIAM:

The jury in this medical malpractice action returned a verdict in favor of the defendant, Dr. N.T. Shanmugham. The appellants, Homer R. Hager, and his wife, Nancy Hager, who were the plaintiffs below, moved, at various times, for a directed verdict, for a judgment notwithstanding the verdict, and to have the verdict set aside. The trial court denied the appellants' motions and entered judgment for Dr. Shanmugham.

On appeal, the appellants claim that the evidence adduced during trial clearly demonstrated that Dr. Shanmugham violated the applicable standard of care and was negligent in performing a urological procedure on the appellant, Homer R. Hager, and that, in fact, Dr. Shanmugham admitted that he violated the standard of care. They also claim that the trial court improperly allowed Dr. Shanmugham's attorney to cross-examine their medical expert by using learned treatises. Under the circumstances, the appellants claim that they were entitled to a malpractice award and that the trial court erred in entering judgment for Dr. Shanmugham.

After reviewing the evidence adduced during trial as well as the questions presented, this Court is of the view that the trial court did not err in denying the appellants' motions and in entering judgment for Dr. Shanmugham. Accordingly, the judgment of the Circuit Court of Kanawha County is affirmed.

In December, 1988, the appellant, Homer Hager, was examined by Dr. Kyle Fort, a urologist in Lewisburg, West Virginia, who had previously treated him for prostate problems. Dr. Fort, as a result of his examination, concluded that Mr. Hager's prostate was constricting around his urethra and that a surgical procedure known as a transurethral resection of the prostate was indicated. Dr. Fort, however, was unwilling to perform the procedure until Mr. Hager, who had had a history of cardiovascular problems, was examined by a cardiologist.

On December 12 or 13, 1988, Mr. Hager was admitted to St. Francis Hospital in Charleston, West Virginia, where he underwent a complete cardiac examination. While he was in the hospital the urological problems caused by the constricting of his urethra worsened, and a urologist, Dr. N.T. Shan-

mugham, the defendant in the present case, was called in for a consultation.

Dr. Shanmugham, like Dr. Fort, concluded that a transurethral resection of Mr. Hager's prostate was indicated, and on December 14, 1988, discussed it with Mr. Hager and his wife. During the discussion, it appears that Dr. Shanmugham advised the Hagers of the risks and complications of the procedure and indicated that the risks and complications included incontinence and impotence. Dr. Shanmugham subsequently documented this conversation regarding the possible risks and complications of the surgery in a progress note dated December 14, 1988.

Mr. Hager decided to undergo the transurethral resection surgery, and on December 15, 1988, Dr. Shanmugham performed it on him.

Following the surgery, Mr. Hager developed persistent incontinence and ultimately consulted Dr. Fort about it. Following the evaluation, Dr. Fort concluded that Mr. Hager's external urinary sphincter, a muscle which plays a significant role in controlling continence, had been injured during the transurethral resection surgery. Dr. Fort subsequently recommended the implantation of an artificial sphincter, and the artificial sphincter was inserted on July 12, 1990. Mr. Hager, who had sometime prior to the transurethral resection surgery had an impotency problem, also suffered a recurrence of that problem. He subsequently had a penile implant for that condition.

Sometime after the development of the post-surgical incontinence and impotency problems, Mr. Hager and his wife instituted the present medical malpractice action against Dr. Shanmugham. They, in essence, claimed that Dr. Shanmugham had damaged Mr. Hager's external urinary sphincter during the prostate surgery and that that damage had resulted from medical malpractice.

The case was tried before a jury on September 8, September 9, September 10, and September 11, 1992.

During trial, the Hagers introduced evidence which showed that prior to the transurethral resection surgery, he had not suffered incontinence and that for at least two years prior to the operation he and his wife had had a satisfying sex life. He also introduced evidence showing that following the procedure he suffered chronic incontinence and impotence.

The Hagers called as an expert witness Dr. Ralph Emerson Duncan, III, a Board certified urologist who was the author of several articles in the field of urology. Dr. Duncan had performed over 1,000 transurethral resection procedures. Dr. Duncan, who had examined Mr. Hager, had observed damage to Mr. Hager's urinary sphincter. Dr. Duncan, who did not have an opinion as to the cause of Mr. Hager's impotency, testified that Mr. Hager's sphincter had been cut on multiple occasions and that the damage caused by those cuts kept it from closing completely, thereby resulting in his incontinence.

Dr. Duncan, who had also reached the conclusion that Dr. Shanmugham had cut and damaged Mr. Hager's sphincter during the transurethral resection, testified that national standards for performance of the transurethral resection procedure indicate that the performing physician is not supposed to cut past an anatomical landmark called the verumontanum. If a doctor does not cut past the verumontanum, then the external sphincter cannot be cut. He concluded that in Mr. Hager's case, Dr. Shanmugham had cut past the verumontanum and cut Mr. Hager's external sphincter and that by so doing, Dr. Shanmugham had violated the applicable standard of care.

The Hagers also introduced the testimony of Dr. Kyle Fort, Mr. Hager's treating urologist in Lewisburg, West Virginia. Dr. Fort, who, like Dr. Duncan, believed that damage to Mr. Hager's external urinary sphincter had caused his incontinence, but who, like Dr. Duncan, had no opinion as to the cause of his impotence, testified that after Dr. Shanmugham's surgery, he had examined Mr. Hager on two occasions and that on each he had found multiple cuts in Mr. Hager's external urinary sphincter. He further testified that approximately one week prior to the surgery by Dr. Shanmugham, he had examined Mr. Hager and had actually visualized his external sphincter and that at that time

no damage existed. Given the fact that the damage existed after Dr. Shanmugham's performance of the procedure, Dr. Fort testified that to a reasonable degree of medical certainty or probability, Mr. Hager's external sphincter was actually cut by Dr. Shanmugham during the procedure in December, 1988.

Dr. Fort testified that a physician who was trained and skilled in the performance of a transurethral resection was not supposed to cut the external urethral sphincter, and that based upon his examination of Mr. Hager, there was no medical reason why Dr. Shanmugham. should have found cutting the sphincter to be necessary. He concluded that the damage to Mr. Hager's sphincter was caused by a mistake and that it should not have occurred if the procedure had been properly performed.

To rebut the Hagers' testimony, Dr. Shanmugham called Dr. Jonathan Jarrow, a Board certified urologist and an associate professor of medicine at Bowman–Gray School of Medicine in Winston–Salem, North Carolina. Dr. Jarrow, who instructed students in the transurethral resection, testified that injury to the external urinary sphincter resulting in incontinence was a known and recognized complication of the procedure. He explained that this was because the internal anatomy of all individuals was not identical and because there were certain moments when a urologist performing transurethral resection could not precisely observe the internal anatomy of the patient. If a patient's internal anatomy was slightly different in certain ways, the urologist, even if he was performing the surgery precisely according to standards, could inadvertently damage the sphincter.[1]

Dr. Jarrow also testified that Dr. Shanmugham had appropriately informed Mr. Hager of the potential risks and complications of the surgery. He also expressed the opinion that Dr. Shanmugham had performed the surgery as would a competent

1. Dr. Jarrow's precise testimony proceeded as follows:

This is the part I said a moment ago this is a little bit over-simplified in that the prostate doesn't normally sit squarely on the sphincter like so, and in actuality, in many people the sphincter runs more at an angle like so, where the top portion of the prostate is actually much shorter than the posterior portion, and in some men, the verumontanum would be located about here and the posterior part of the prostate actually extends well beyond the verumontanum, and in some cases, not according to this case, but in some instances, one would have to resect beyond the verumontanum to resect some of that tissue posteriorly or towards the rectum. But this is where a complication such as an injury to the sphincter can occur.

Number one, the resectoscope sheath has an angled beak on it, which you can see right here. It has an angled beak on it.

Q: It is hard plastic, is that what that is?

A: This is hard plastic. And as you pass this through the urethra into the bladder, it is possible to damage the sphincter at the top part exactly where it was described by Dr. Fort in his cystoscopy note with the tip of this scope. That's one possibility.

Another possibility is that as you're doing your resection, you're looking through a lens and the lens does not provide a clear panoramic view as you have right now, looking around this room. It provides a focused view where you're working, and that view is tilted down about 30 degrees. We normally do this with a 30 degree lens. And so when you're doing your resection posteriorly, you're looking down and you have this verumontanum, that marks the distal mark of your resection, the furthest out you're supposed to go toward the sphincter, and you have this in view as you're resecting the prostate gland and you can sit there and look at it, have it in front of you and resect right up to that all the time.

Then when you go to resect this anterior tissue, the tissue above here, you have to swivel the scope. And what you would normally do in doing a TURP, the way I do it, is you go out to the verumontanum, stop, swivel the scope and then you resect to that point. While you're resecting at this time, you do not see the verumontanum, and so you would take a couple of bites that way, go back, reconfirm where you're at and then swivel it back up and keep on resecting. That's assuming the prostate anteriorly is ending right where the verumontanum is located, and that's the way it is most of the time. One way the sphincter could be injured is that you wander too far out during that swivel.

The other way that the sphincter could be injured is that the patient's anatomy is just a little bit differed from what we routinely see, and rather than the prostate extending to the verumontanum anteriorly, it stops there and the sphincter mechanism is lying like this, so that where you're sitting at this verumontanum, swivel your scope and do your resection like you normally would, you're actually resecting the sphincter without even being aware of it.

urologist and that Mr. Hager had simply experienced a known and recognized complication.

During trial, Dr. Shanmugham testified that in performing a normal transurethral resection procedure, a physician was not supposed to excise or cut or remove tissue that was a part of the external urinary sphincter. He also admitted that the medical evidence showed that Mr. Hager's sphincter had been cut and that he had cut it.[2] He further testified:

Q: Do you believe you were negligent in the way you performed this surgery?

A: No, Sir. I took all precautions that I'm supposed to take and did the way I was taught to do this procedure, do the way I learned to do the procedure. I did not see any problem during surgery and I didn't see any problems suspected after the surgery.

Q: And this, in your opinion, is a generally recognized complication of TURP?

A: Generally recognized complication.

At the conclusion of the trial, as previously indicated, the jury found for Dr. Shanmugham and refused to award the appellants damages.

On appeal the appellants principal contention is that the evidence admitted during trial clearly showed that the defendant Dr. Shanmugham violated the applicable standard of care and was therefore negligent. Under the circumstances they claim that they were entitled to a verdict in their favor.

■ In *Orr v. Crowder*, 173 W.Va. 335, 315 S.E.2d 593 (1983), *cert. denied*, 469 U.S. 981, 105 S.Ct. 384, 83 L.Ed.2d 319 (1984), this Court analyzed the circumstances which a trial court should analyze in determining whether there is sufficient evidence to support a jury's verdict. The Court summarized its conclusions in syllabus point 5, as follows:

In determining whether there is sufficient evidence to support a jury verdict the court should: (1) consider the evidence most favorable to the prevailing party; (2) assume that all conflicts in the evidence were resolved by the jury in favor of the prevailing party; (3) assume as proved all facts which the prevailing party's evidence tends to prove; and (4) give to the prevailing party the benefit of all favorable inferences which reasonably may be drawn from the facts proved.

*See also, McClung v. Marion County Commission,* 178 W.Va. 444, 360 S.E.2d 221 (1987).

In the present case, the defendant, Dr. Shanmugham, in his own defense called as an expert witness Dr. Jonathan Jarrow, who was a board certified urologist and an assistant professor of medicine at Bowman–Gray School of Medicine in Winston–Salem, North Carolina. Dr. Jarrow essentially explained that the transurethral procedure was designed to prevent damage to the patient's external sphincter. He, however, further indicated that in the average individual the external sphincter lay very close to the prostate where the resection occurred and that in a percentage of individuals the internal anatomy was such that internal organs were not precisely in the same position as in the average individual. Such a variation in internal anatomy was potentially not detectable in the type of procedure that Mr. Hager underwent.

Dr. Jarrow further stated that if there was a variation in anatomy of Mr. Hager, Dr. Shanmugham might have injured his external sphincter even though he performed the transurethral resection procedure routinely, that is in a non-negligent manner. He indicated that because injury could occur to the sphincter even though the physician performed the surgery in the normal, recognized, and non-negligent way, damage to the sphincter was a medically recognized possible complication of the procedure. He said:

2. The testimony proceeded as follows:

Q: ... Isn't it correct, Doctor, that even though there was no medical reason to cut below the verumontanum, even though you're not supposed to cut below the verumontanum, in this instance, not intentionally, but in this instance,

you did cut his external sphincter, isn't that correct?

A: Going by the other physician's report, there has been damage to the sphincter, yes, sir.

Q: And you did it?

A: Yes, I accept that, yes.

We all try to avoid that complication but it's not always possible, and that's why we warn patients that that's a possibility that the sphincter could be damaged, that they could be incontinent after the procedure. It's rare, it's uncommon, it only happens about one percent of the time, but it does happen ...

Dr. Jarrow further testified that he had reviewed Mr. Hager's records that he believed that Dr. Shanmugham had performed the transurethral procedure on Mr. Hager appropriately.[3] He also testified that a sphincter injury could occur without the physician being negligent and that he believed that that had occurred in Mr. Hager's case.[4]

■ As indicated in syllabus point 5 of *Orr v. Crowder, supra,* in determining where there was sufficient evidence to support the jury's verdict it was incumbent upon the trial court, as it is on this Court, to consider the evidence in the light most favorable to Dr. Shanmugham, the prevailing party, and to assume as proved all facts which Dr. Shanmugham's evidence tends to prove. Also he must be given the benefit of all favorable inferences which may reasonably be drawn from the facts proved.

Rather clearly Dr. Jarrow's testimony tended to show that because of individual variations in patient anatomy it was possible that a physician who performed a transurethral resection of the prostate could injure the patient's external sphincter and cause incontinence even though he performed the procedure according to generally accepted procedures and even though he was not negligent. Dr. Jarrow also testified that he had reviewed the records relating to Mr. Hager's procedure and that he had concluded that

Dr. Shanmugham had performed the procedure appropriately.

In this Court's view, the evidence when considered in the light most favorable to Dr. Shanmugham suggests that Dr. Shanmugham did perform the procedure appropriately and that there were plausible reasons why Mr. Hager could have suffered injury to his external sphincter without Dr. Shanmugham being negligent.

While the testimony of Dr. Duncan, to a large extent, as well as that of Dr. Kyle, tended to contradict that of Dr. Jarrow, it is properly within the purview of the jury to resolve conflicts in the testimony, and, as indicated in syllabus point 5 of *Orr v. Crowder, supra,* in determining whether there was sufficient evidence to support the jury's verdict it is incumbent upon this Court to consider the evidence most favorable to the prevailing party and to assume that all conflicts were resolved by the jury in favor of the prevailing party.

The Court notes that the appellants vigorously assert that at trial Dr. Shanmugham admitted that he violated the applicable standard of care.

A fair reading of the evidence shows that Dr. Shanmugham did admit that he cut Mr. Hager's external sphincter and that that should not be done in a transurethral resection procedure. He also admitted that cutting the sphincter was almost certainly the cause of Mr. Hager's incontinence. He also admitted that a physician should not resect beyond the verumontanum and that he likely did that.

On the other hand he testified that he did the procedure the way he was taught to do it and that he did not believe that he was negligent in any way.[5]

---

3. The actual testimony proceeded as follows:
   Q: Now Doctor, from a review of that information, do you have an opinion as to whether Dr. Shanmugham performed the TURP procedure appropriately?
   A: I do.
   Q: What is that opinion, sir?
   A: My opinion is that it was performed appropriately.

4. Dr. Jarrow's testimony was:
   Q: And sphincter injury can occur without there being negligence, true?

5. Dr. Shanmugham testified:
   Q: Do you believe you were negligent in the way you performed this surgery?
   A: That is correct.
   Q: And do you believe that's what happened in this case?
   A: Yes, sir.
   Q: Did the surgical technique of Dr. Shanmugham as dictated in his operative note and as described by him in his deposition, did that appear to be done appropriately?
   A: Yes, it did.

■ While in this Court's view, portions of Dr. Shanmugham's testimony, when taken out of context, suggest that he admitted that he violated the applicable standard of care, a full reading of his specific words in the context of his overall testimony as well as the testimony of his expert, Dr. Jarrow, suggests that he was really saying that it was undesirable for a physician to cut a patient's external sphincter, and certainly the resection procedure was designed to avoid cutting the sphincter. However, such cutting could occur, even if the operation was perfectly performed and even if there was no negligence. In effect, it was an unavoidable complication that occasionally occurred, and as explained by Dr. Jarrow, it occurred because of the undetectable variations in the internal anatomy of a few individuals.

On appeal the appellants also claim that the circuit court erred in allowing Dr. Shanmugham's counsel to attempt to cross-examine their expert witness, Dr. Duncan, through the use of learned treatises. They argue that because Dr. Duncan did not rely upon learned treatises and refused to acknowledge that they were authoritative in his field, the trial court improperly allowed Dr. Shanmugham's counsel to cross-examine him on statements found within them.

Throughout cross-examination Dr. Duncan refused to admit that certain treatises and articles which the defense wished to use for impeachment were authoritative. When defense counsel pressed the point, the plaintiffs' counsel objected and requested a bench conference. At the bench conference plaintiffs' counsel stated:

> Judge, we object. Under the West Virginia Rules of Evidence, the only treatises the experts can testify about is what they believe is authoritative, and this witness has already testified that he doesn't consider any of the medical treatises authoritative, and therefore I object to this continuing line of questioning because this Doctor said they're not authoritative, and he's stated that, and it's over with and he

> can't ask him about it, and therefore it's objectionable.

Defense counsel, in response, took the position that a treatise could be used for cross-examination even if the cross-examined witness refused to recognize its authoritativeness if another expert witness testified that it was authoritative. He further indicated that he was going to introduce expert testimony indicating that the material which he wanted to use for cross-examination was authoritative. The trial judge ruled that he could take judicial notice that the material was recognized medical material and that the defense was going to introduce expert medical opinion on its character. In effect, he ruled that the cross-examination was allowable.

Rule 803(18) of the West Virginia Rules of Evidence establishes the parameters for cross-examination of experts by the use of learned treatises. That Rule states:

> *Learned Treatises* —To the extent called to the attention of an expert witness upon cross-examination or relied upon the expert witness in direct examination, statements contained in published treatises, periodicals, or pamphlets on the subject of history, medicine or other science or art, established as a reliable authority by the testimony or admission of the witness or by expert testimony or by judicial notice. If admitted, the statements may be read into evidence but may not be received as exhibits.

■ In *Thornton v. CAMC, Etc.*, 172 W.Va. 360, 305 S.E.2d 316 (1983), this Court discussed at some length the use of learned treatises to impeach an expert witness. In that case, the Court recognized that there are two circumstances under which a party may, consistent with Rule 803(18) of the Rules of Evidence, use learned treatises to impeach an expert witness. The first circumstance arises if the witness himself recognizes that the treatise is authoritative.

A: No, sir. I took all precautions that I'm supposed to take and did the way I was taught to do this procedure. I did not see any problem during the surgery and I didn't see problems suspected after the surgery.

Q: And this, in your opinion, is a generally recognized complication of TURP?
A: Generally recognized complication.

The Court summarized this rule in syllabus point 3 of the *Thornton* decision as follows:

> Where a treatise is recognized by a medical expert witness as authoritative, then he can be asked about its statements for purposes of impeachment during cross-examination.

Additionally, the Court indicated:

> We also agree with those courts that hold that if a medical expert witness refuses to recognize a medical treatise as authoritative, the cross-examining party may prove the authoritativeness of the medical treatise, either through judicial notice or through the testimony of another medical expert witness. Once the trial court has concluded that the authoritativeness of the medical treatise has been established, then the expert may be cross-examined on it.

*Thornton v. CAMC, Etc., supra* at 365, 305 S.E.2d at 322. The Court restated its conclusion relating to use of treatises when a cross-examined expert refuses to recognize them in syllabus point 4 of *Thornton*, as follows:

> If a medical expert witness refuses to recognize a medical treatise as authoritative, the cross-examining party may prove the authoritativeness of the medical treatise, either through judicial notice or through the testimony of another medical expert witness. Once the trial court has concluded that the authoritativeness of the medical treatise has been established, then the expert may be cross-examined on it.

In examining the record in the present case this Court finds that Dr. Duncan consistently denied that the learned articles and materials mentioned by defense counsel during cross-examination were authoritative. When plaintiffs' counsel objected to a continuation of the cross-examination, the trial court ruled that the fact that Dr. Duncan refused to accept the authoritativeness of the material did not preclude its use by defense counsel. The court, in essence, noted that authoritativeness could be established by judicial notice or by another expert and ruled, "I can take judicial notice that it's a piece of literature that's a book, and it's a recognized medical book." The court also noted that defense counsel had said that he would introduce expert evidence indicating that the material was authoritative. The court, therefore, allowed its use.

Dr. Shanmugham later testified that the literature used for the cross-examination of Dr. Duncan was authoritative. Dr. Shanmugham's supporting expert, Dr. Jarrow, also testified to the authoritativeness of the material.

In this Court's view, the authoritativeness of the material used for cross-examination was adequately established. Plaintiffs' counsel essentially took the position that learned materials could be used for the cross-examination of Dr. Duncan only if Dr. Duncan himself recognized their authoritativeness. The trial court correctly recognized, in line with the rules set forth in *Thornton v. CAMC, Etc., Id.*, that the materials could be used if he took judicial notice of their authoritativeness or if another expert indicated that they were authoritative.

A careful reading of *Thornton* indicates that if other expert testimony is the basis for the finding of authoritativeness the other expert testimony properly should be introduced before the court makes its rule, and that was not done in this case. However, since the expert evidence of authoritativeness was later introduced, this Court finds that any error in ruling before the evidence was introduced was cured by the later introduction.

Having concluded that there is no reversible error in this case, this Court concludes that the judgment of the Circuit Court of Kanawha County should be affirmed.

Affirmed.

NEELY, J., dissents.